IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.:19-cv-02418

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff

        v.

HARTMAN WRIGHT GROUP, LLC and

TYTUS W. HARKINS

     Defendants

---

## COMPLAINT

---

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), alleges as follows:

### NATURE OF THE ACTION

1.     From 2015 through 2017, Defendants Hartman Wright Group, LLC ("HWG"), a so-called private wealth management company that invested in mobile home parks, and HWG's founder and co-owner, Tytus Harkins, raised over $8 million from individual investors based upon a series of false and misleading statements.

2.     Defendants HWG and Harkins further engaged in a fraudulent scheme by, among other things, diverting investors' funds for undisclosed purposes, including using some investors' funds to make Ponzi-like payments to other investors.  HWG and its affiliated

entities are now in default on numerous debt investments, leaving its investors with millions in probable losses.

3.     HWG and Harkins told investors that HWG sought to find distressed or undervalued mobile home parks, purchase them using investor money, make capital improvements, and then sell them for a profit or refinance the deals within three years.

4.     HWG and Harkins promised investors and potential investors returns of 6-8% interest per year, and also included an equity ownership in some of its securities offerings. Investors received monthly interest payments, often from other investor funds in Ponzi-like fashion, until February 2018, when HWG stopped making payments.

5.     HWG's and Harkins' false and misleading statements included overstating the purchase price on properties, failing to use investor money for the properties as represented, including paying Harkins and his co-founder undisclosed bonuses, misrepresenting amounts they invested in properties, and overstating HWG's financial position.  HWG and Harkins also engaged in a fraudulent scheme to conceal this information, including making Ponzi-like payments.

6.     HWG also offered and sold securities without registering the transactions, and without qualifying for any exemption from registration.

7.     As a result of this conduct, HWG and Harkins violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), (c) and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

8.      The SEC brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa].  HWG and Harkins, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

9.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because HWG is a Colorado limited liability corporation, previously headquartered and operated in Monument, Colorado.  Further, certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, including the solicitation of investors from the district.

## DEFENDANTS

10.      **Hartman Wright Group, LLC**, is a Colorado limited liability corporation, previously headquartered and operated in Monument, Colorado, and now operating in Laurel, Montana.  HWG held itself out to investors as a "private wealth management company," though its sole investment strategy focused on purchasing mobile home parks, then refurbishing, operating, and reselling them.

11.      **Tytus W. Harkins**, age 37, is a resident of Laurel, Montana.  Harkins is HWG's founding principal, co-owner, and Director of Finance and Fund Management.

## FACTS

### A.  Background and Description of the Fraudulent Offerings

12.     Harkins and his co-founder created HWG to find distressed or undervalued mobile home parks, raise money from investors to purchase the parks and make capital improvements, and then sell the parks for a profit or refinance the deals within a three-year time frame.

13.     To facilitate the purchase of the mobile home parks, HWG and Harkins created individual limited liability companies ("LLCs") in which investor money and, at times, HWG money was pooled and then used to purchase specific mobile home parks.  HWG owned and controlled the LLCs, but provided certain of the investors in the LLC with the ability to earn profits based on the appreciation in value of the specific mobile home park that the LLC owned (i.e., investors were promised a share of any profits realized from the sale or refinancing of the specific mobile home park).

14.     Most of the purchased mobile home parks needed capital investments to improve their performance and become profitable.  As a result, HWG and Harkins solicited additional investors to help fund these improvements.

15.     Through the use of mailing lists, finders, personal finance seminars, and a company website, HWG identified potential investors, primarily older, retired individuals interested in income producing investments.

16.     Harkins located potential investors, had direct communications with potential investors and investors through financial seminars and other means, and drafted the offering documents, which he called "cut-sheets," that were provided to potential investors and investors for all of the investments.

17.     In its sales pitches and offering documents, Harkins and HWG claimed that it located under-managed properties that could be purchased at below-market prices and then revitalized through capital investment and more effective management.  Once an investor expressed interest, Harkins typically communicated with them about various investment opportunities that were available.

18.     HWG raised money for the mobile home park investments through a series of unregistered securities offerings that promised investors interest income and, in some cases, equity ownership.

19.     HWG offered three types of investments, each of which was a security:

a.     <u>"6&25 Investments"</u> – In this offering, HWG-owned LLCs sold promissory notes to investors.  The LLC then used these note proceeds to purchase specific mobile home parks.  The promissory notes were secured by real property owned by the LLC.  Investors were promised interest on their investment, generally 6-8% annually, and a 25% ownership interest in any profits generated by the LLC through its acquisition, development, management, and ultimate sale of the property.  HWG offered so-called 6&25 Investments at the time it acquired a new mobile home park.

b.     <u>"Loan Participations"</u> – In this offering, investors purchased participation interests in loans that HWG purportedly made to a specific LLC.  Investors were promised an annual fixed rate of interest on the investment, typically 6-8%. HWG represented to investors that the proceeds from the loans HWG purportedly made to the LLC (in which investors in the Loan Participations now had an interest) were to be used to develop, manage, and fund

improvements on the specific mobile home park owned by the LLC.  HWG represented to investors that investors received as collateral for their investment a pro rata share of HWG's lien on the LLC's property that secured HWG's loan.

c. "Corporate Notes" – In this offering, investors loaned money directly to HWG for general corporate use.  The investments were guaranteed by HWG's assets and typically paid 7.2% interest annually.  HWG raised money from investors through Corporate Notes in 2016 and 2017 to fund its operations because its mobile home park operations were almost entirely unprofitable.

**B.  HWG and Harkins Made Misrepresentations and Omissions Related to the 6&25 Investments, Loan Participations, and the Corporate Notes.**

20.     To induce investment in the offerings described above, from 2015 through 2017, HWG and Harkins made material misstatements and omissions to investors, including overstating the purchase price on properties, failing to use the money for the specific LLC as represented, misrepresenting amounts it invested in properties, and overstating its financial position.

**1.  HWG and Harkins Made Misrepresentations and Omissions Related to the Sale of 6&25 Investments.**

21.     After identifying a property to purchase, Harkins or his co-founder created a limited liability company in the name of the property and Harkins solicited investors to fund the transaction.  Harkins drafted the offering documents, which described the investment and included the following information:

- A description of the specific mobile home park for which the investor's money was being sought, including its location and operating results;

- A representation that money raised would be used to purchase and fund the operations of and improvements on the property identified;

- A prospective profit and loss statement for the property that identified the purchase price of the property and amounts to be used for capital improvement; and

- An investment analysis projecting investment earnings and the annual return on investment.

22.     Harkins created the offering documents, had ultimate authority over the statements therein, and/or disseminated those statements to potential investors via email and other means of interstate communication.  HWG, through Harkins, also had control over the misstatements disseminated to potential investors through the offering documents.

23.     From 2015 to 2017, HWG raised a total of $2.27 million from multiple investors in four separate LLCs (North Park Manor MHP LLC ("North Park"); Pine Tree MHP LLC ("Pine Tree"); Rosewood MHP LLC ("Rosewood"); and Pleasant Hill MHP LLC ("Pleasant Hill")) and their respective properties.  Harkins created and used separate offering documents for each LLC to solicit investors via interstate commerce.  Each offering document contained material false and misleading statements and material omissions.

a.      **False and Misleading Statements About the Purchase Price**

24.     On each occasion, the offering document stated a "purchase price" for the mobile home park being purchased.  However, on each occasion, the purchase price disclosed to the investor was overstated and therefore false and misleading.

25.     HWG and Harkins stated that they paid $735,000 for the North Park mobile home park.  HWG and Harkins raised approximately $500,000 from investors based on this representation.  In fact, HWG only paid $510,000 for the property, and failed to disclose the $225,000 or 44% difference to investors.

26.     Similarly, HWG and Harkins stated that they paid $1,100,000 for the Pine Tree mobile home park.  HWG and Harkins raised approximately $800,000 from investors based on this representation.  In fact, HWG only paid $850,000 for the property, and failed to disclose the $250,000 or 29% difference to investors.

27.     HWG and Harkins stated that they paid $1,200,000 for the Rosewood mobile home park.  HWG and Harkins raised approximately $1,000,000 from investors based on this representation.  In fact, HWG only paid $1,030,000 for the property, and failed to disclose the $170,000 or 16.5% difference to investors.

28.     HWG and Harkins stated that they paid $759,000 for the Pleasant Hill mobile home park.  HWG and Harkins raised approximately $500,000 from investors based on this representation.  In fact, HWG paid only $440,000 for the property, and failed to disclose the $319,000 or 72.5% difference to investors.

29.     Because HWG and Harkins represented to investors that their 6&25 Investments were secured by the specific real property investments, HWG's and Harkins' inflation of the purchase price of the mobile home park properties misrepresented the security of the investor's investment.

**b.      False and Misleading Statements About the Use of 6&25 Investors' Money**

30.     In addition to misrepresenting the purchase price of the mobile home parks, in one instance, HWG and Harkins also made false and misleading statements in the offering documents about the use of an investor's money.

31.     Specifically, in connection with the Pleasant Hill project, HWG gave the investor a one-page offering document representing that the capital HWG was seeking was to "facilitate purchase and fund the operations and improvements of <u>this project</u>" (emphasis added).  This statement was false and misleading.  In fact, HWG used more than $435,000 of the $500,000 raised to invest in different properties owned by other LLCs.

32.     Based on the false and misleading offering document, an individual invested $500,000 in exchange for a promissory note that paid 6% annual interest and a 25% equity ownership in the Pleasant Hill joint venture.

33.     However, the actual purchase price of the Pleasant Hill property was only $440,000, and over $370,000 of that amount was covered by seller financing.

34.     At the closing, HWG and Harkins used only approximately $64,000 of the investor's money to purchase the property and, unbeknownst to the investor, immediately transferred the remaining $436,000 of the investment to purchase three other mobile home parks on the same day.

35.     As a result, the investor's security interest (behind the seller) in the mobile home park was only backed by the $64,000 actually paid for the park, not by his $500,000 investment, and he received no ownership or security interest in the other mobile home parks purchased with his funds.

36.     Later, when HWG could no longer make payments on the four properties, the seller of the Pleasant Hill property, who provided the seller financing, foreclosed on the properties and the investor lost his entire investment.

### c.     HWG's and Harkins' Statements Were False, Misleading, Material and Made with Scienter.

37.     At the time that HWG and Harkins made the representations in the 6&25 offering documents, HWG and Harkins knew that the actual purchase price of the properties was substantially lower than the price represented.  They also knew at the time of the offerings that such inflated purchase prices reduced investors' potential profits, and overstated investors' security interests.  They also knew at the time of the offers that they intended to use the investor money for the undisclosed purposes of acquiring separate properties.

38.     A reasonable investor would have understood from HWG's and Harkins' disclosures that the disclosed properties were purchased from third-party sellers at the prices represented by HWG, that the profitability and security of their investments were not impaired by the overstated purchase prices, and that their investments were used for the particular property specified by HWG.

39.     Each of the above disclosures regarding the purchase price of properties and intended use of investor proceeds were false when made, and Harkins and HWG knew or were reckless in not knowing, and should have known that their statements were false and misleading.

40.     HWG and Harkins omitted to state material facts that were necessary to render their disclosures and representations regarding the actual purchase price of properties and use of investor funds not misleading.

41.      The above misrepresentations and omissions as to the actual purchase price of properties and use of investor funds were material to investors and potential investors because

the actual purchase price and use of investor funds had a direct relationship to the profitability and security of their investments.  Moreover, due to their equity investment, investors would have also wanted to know about the inflated purchase price of the mobile home parks because it directly impacts any equity gains following the sale of the property.  For example, with respect to North Park, HWG and Harkins would have had to sell the property for greater than $735,000 for an investor to receive any profits.  In reality, and undisclosed to investors, the property only cost HWG and Harkins $510,000, making it significantly less likely that investors would realize any profit potential from the sale of the property.

### 2. HWG and Harkins Made Material Misrepresentations and Omissions Related to Sales of Loan Participations.

42.     HWG and Harkins also raised money purportedly for maintenance and capital improvements of the mobile home parks through Loan Participations.

43.     Offering documents for the Loan Participations included a "Participation Agreement" to be signed on behalf of HWG by Harkins and the respective investors that stated that HWG had "originated a loan" to the specified LLC and stated the amount of the loan.  These Participation Agreements represented to investors that HWG made a loan to the LLC that owned the mobile home park, filed a lien on the property as security, and offered investors a participation interest in HWG's loan and a *pro rata* security interest in the property.  Simultaneously, the LLC issued the investor a promissory note paying approximately 8% annual interest in monthly pro-rata distributions

44.     The Participation Agreement also included a "Participation Certificate," signed on behalf of HWG by Harkins and the investors, which stated the total amount of HWG's loan and the "Total Loan Disbursed To Date," typically the full amount of HWG's stated loan.

45.     From 2015 to 2017, HWG raised a total of $5.18 million from 20 Loan Participation investors in five different properties – Country Estates; Farr Road; Albany Dunes Loblolly (a combination of two parks held by Stevens MHP, LLC and Albany Dunes, LLC); North Park Manor; and Rosewood – representing in each case that it had made loans to the LLCs.

46.     Contrary to the statements in the Participation Agreements, HWG never funded its loans to any of the LLCs, and at Harkins' direction, the money that investors gave to HWG for the purported Loan Participations was immediately comingled and directed to HWG's own accounts and used for general operating expenses, including maintenance and interest payments for the property as well as for other properties owned by other LLCs.

47.     HWG and Harkins also used investor money to enrich themselves, paying Harkins and his co-founder at least $60,400 in undisclosed "bonuses," which they split evenly and to which they were not entitled.  For example, in the Country Estates MHP Holding, LLC participation investment, HWG directed $250,000 of the approximately $460,000 investor money that was raised into HWG's own account and Harkins and his co-founder split 10% of this money.

48.     A reasonable investor would have understood from the Participation Agreements that their funds were used to fund loans to specific LLCs and not commingled for general operating expenses, used for maintenance and interest payments on other properties, or used to pay HWG and Harkins.

49.     Each of the above disclosures regarding the intended use of investor funds were false when made, and HWG and Harkins knew or were reckless in not knowing and should have

known that their statements were false and misleading because they were aware that the funds were, in fact, not used for the disclosed purpose.

50. HWG and Harkins omitted to state material facts that were necessary to render their disclosures and representations regarding the actual use of investor funds not misleading.

51. The above misrepresentations and omissions as to the intended use of investor funds were material to investors and potential investors because, among other things, HWG significantly impaired the profitability and security of loans secured by a particular property when they diverted investor funds to other properties and purposes.

### 3. HWG and Harkins Made Misrepresentations Related to the Sale of Corporate Notes.

52. HWG offered new and existing investors direct investment in HWG via a short term note that paid 2% per month over a three-month term, and longer term notes that paid 7.2% annual interest over a seven-year term.

53. HWG conducted four separate note offerings and raised $1.78 million from four investors.

54. Between August 2016 and June 2017, HWG and Harkins created and sent each of the prospective investors a one-page offering document providing an executive summary and the terms of the investment.

55. The offering document claimed that HWG was "currently seeing revenues in the $4 million range" and that the Corporate Notes were guaranteed by HWG's "approximately $15 M in assets." These statements were false and misleading.

56. In January and June 2017, Harkins sent two of the prospective investors an HWG balance sheet as of December 31, 2016, that claimed assets of $16.2 million and owner's equity of $4.1 million. These statements were false and misleading.

57.     Each of the above disclosures and representations regarding the financial condition of HWG were false when made, and Harkins and HWG knew or were reckless in not knowing and should have known that the offering documents were false and misleading because:

- In July 2016, Harkins received a copy of HWG's balance sheet showing total assets of only $7.87 million; and

- On January 19, 2017, HWG's controller sent financial statements to Harkins, including a balance sheet for the period ended December 31, 2016, and a profit and loss statement for the period January through December 2016, showing HWG had only $2.7 million in total revenue, only $9.8 million in total assets, and negative $2.2 million in equity.

58.     Harkins inflated the revenue, assets, and equity numbers he received from the controller before sending the financial information to investors in January and June 2017.

59.     The above misrepresentations as to the financial condition of HWG were material to investors and potential investors because, among other things, the financial condition of HWG had a direct bearing on the likelihood of earning returns on their investments and the security for their investments.

### C. Harkins and HWG Engaged in Deceptive Acts and Practices that Operated as a Scheme to Defraud their Investors.

60.     Through the conduct described above, Harkins and HWG employed a device, scheme, and artifice to defraud HWG investors from learning the true purchase price of mobile home parks they purchased, the intended uses of investors' funds, the existence of bonuses, the amounts of investor funds used to maintain and improve properties, and HWG's true financial condition. Through the conduct described above, HWG and Harkins similarly engaged in an act, practice, or course of business that operated as a fraud or deceit on HWG investors.

61.   Harkins and HWG also committed additional, deceptive acts in furtherance of this scheme. Among other things, HWG and Harkins:

    a.   Paid undisclosed monies to Harkins, HWG, and HWG's other principal after overstating the purchase price of properties;

    b.   Did not fund loans to the LLCs as represented and required by the Participation Agreements;

    c.   Used some investors' funds to make Ponzi-like payments to other investors.  Specifically, even though HWG failed to fund the loans to the LLCs, HWG caused the LLCs to service the interest payments to the Loan Participation investors as if the loan had been funded, requiring monthly interest payments to be made.  Because nearly all of the parks remained unprofitable, the interest payments to Loan Participation investors were typically made, at least in part, by money received from new investors in other properties;

    d.   Used investor funds for undisclosed purposes, including bonuses paid to Harkins and HWG's other principal, the purchase of other properties, and for general operating expenses for properties other than the properties investors had selected for investment; and

    e.   Created an offering document and balance sheet that materially misstated HWG's assets, owner's equity, and revenue and disseminated those documents to prospective HWG investors in order to solicit investments.

62.   In light of all of the above-alleged facts, as well as Harkins' background, education, and job responsibilities, Harkins and, through Harkins, HWG, knew or were reckless

in not knowing, and should have known that their conduct was deceptive and resulted in misstatements and omissions.

63.     Harkins' and HWG's deceptive conduct was material because a reasonable investor would want to know, among other things, how their monies would be utilized, HWG's true financial condition, and whether he or she would be receiving Ponzi-style payments when deciding whether to invest.

### D. The 6&25 Investments, Loan Participations, and Corporate Notes were all Securities.

64.     The 6&25 Investments, Loan Participations, and the Corporate Notes are each securities as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define "security" to include "any note."

65.     The 6&25 Investments were "notes" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  Buyers of the 6&25 Investments were motivated by their planned receipt of interest payments on their investments, as well as the prospect of sharing in profits from the contemplated resale of mobile home parks.  In selling the 6&25 Investments, HWG sought financing to execute its business plan to purchase, improve, and resell mobile home parks.  Though not publicly traded, HWG sold the 6&25 Investments to multiple investors using a general solicitation, including through mailing lists, seminars and its website.  Reasonable investors believed that the 6&25 Investments were investments, because, among other things, HWG labeled them as investments in offering documents, and marketed them as investments in its presentations, and on its website.  The 6&25 Investments were not covered by any other regulatory scheme.

66.     The Loan Participations were "notes" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  Buyers of the Loan Participations were motivated by their planned receipt of interest payments on their investments.  In selling the Loan Participations, HWG sought financing to execute its business plan to improve and resell numerous mobile home parks.  Though not publicly traded, HWG sold the Loan Participations to twenty different investors using a general solicitation, including through mailing lists, seminars and its website.  Reasonable investors believed that the Loan Participations were investments, because, among other things, HWG labeled them as investments in offering documents, and marketed them as investments in its presentations and on its website.  The Loan Participations were not covered by any other regulatory scheme.

67.     The Corporate Notes were "notes" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  Buyers of the Corporate Notes were motivated by their planned receipt of interest payments on their investments.  In selling the Corporate Notes, HWG sought financing to execute its business plan to improve and resell numerous mobile home parks.  Though not publicly traded, HWG sold the Corporate Notes to multiple investors using a general solicitation, including through mailing lists, seminars and its website.  Reasonable investors believed that the Corporate Notes were investments, because, among other things, HWG labeled them as investments in offering documents, and marketed them as investments in its presentations.  The Corporate Notes were not covered by any other regulatory scheme.

68.     Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act also define "security" to include, among other things, "investment contracts."  An investment contract exists where a person invests his or her money, in a common enterprise, and is led to expect profits solely from the efforts of the promoter or a third party.

69.     The 6&25 Investments were investment contracts.  The 6&25 investors made an investment of money.  The 6&25 Investments were part of a common enterprise whereby HWG solicited investments in order to execute its business plan to acquire, collectively manage and improve, and then resell numerous mobile home parks.  Although 6&25 investors received an equity interest in a purported joint venture, no investor played any role in managing HWG's business, generating any profits for the 6&25 Investments, nor did the investors have the experience or knowledge to manage the investments.  HWG purchased the mobile home parks, and was solely responsible to manage the properties, make the capital improvements, and eventually sell or refinance them for a profit.  After 6&25 investors provided their funds to HWG, the investors had no control over how their money was used.  Profits from the 6&25 Investments was to be derived solely from the efforts of HWG.

70.     The Loan Participations were investment contracts.  The Loan Participations investors made an investment of money.  The Loan Participations were part of a common enterprise where multiple investors invested money and received shares of loans allegedly made by HWG to certain LLC's.  The expected profitability of the Loan Participations was to be derived solely from the efforts of HWG.  No investor played any role in generating any profits for the Loan Participations.

71.     The Corporate Notes were investment contracts.  The Corporate Notes were part of a common enterprise where multiple investors invested money in HWG as part of various bond offerings intended to raise money to "bolster [HWG's] cash reserves for procuring property finance packages."  The expected profitability of the Corporate Notes was to be derived solely from the efforts of HWG.  No investor played any role in generating any profits for the Corporate Notes.

### E.  Unregistered Securities Transactions

72.     Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to send a security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security.  A registration statement is transaction specific.  Each offer and sale of a security must either be made under a registration statement or fall under a registration exemption.

73.     From 2015 to 2017, in connection with the 6&25 Investments, Loan Participations, and Corporate Notes, HWG and Harkins offered and sold securities of HWG when no registration statement was filed or in effect for the transactions.  Harkins was a necessary and substantial participant in the HWG offers and sales.  Among other things, he drafted the offering materials and solicited investors.

74.     No registration statement was filed  or in effect with the SEC in connection with the offer and sale of the 6&25 Investments, Loan Participations, or Corporate Notes.

75.     The 6&25 Investments, the Loan Participations, and the Corporate Notes were not exempt from the registration requirements of Sections 5(a) and (c) of the Securities Act.

76.     HWG and Harkins offered and sold securities using the means or instruments of interstate commerce, including but not limited to telephones, the Internet, commercial couriers, and the mails.

### FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities: Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

77.     Paragraphs 1 through 76 are hereby realleged and incorporated by reference.

78.     By engaging in the conduct described above, Harkins and HWG, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (1) employed a device, scheme or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statements of material fact or omission to state a material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

79.     By reason of the foregoing conduct, Harkins and HWG violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act.

## SECOND CLAIM FOR RELIEF
**Fraud in the Purchase or Sale of Securities: Section 10(b) of the Exchange Act and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

80.     Paragraphs 1 through 76 are hereby realleged and incorporated by reference.

81.     By engaging in the conduct described above, Harkins and HWG directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

82.     By reason of the foregoing conduct, Harkins and HWG violated, and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### THIRD CLAIM FOR RELIEF
**Offer and Sale of Unregistered Securities: Sections 5(a) and (c) of the Securities Act
[15 U.S.C. § 77e(a) and (c)]**

83.     Paragraphs 1 through 76 are hereby realleged and incorporated by reference.

84.     The 6&25 Investments, Loan Participations, and Corporate Notes that the Harkins and HWG offered and sold to public investors are "securities" as that term is defined in Section 2(a)(1) of the Securities Act and Section 2(10) the Exchange Act, 15 U.S. C. §§ 77b(a)(1) and 78(b)(10).

85.     Harkins and HWG, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of an offering document or otherwise, or caused to be carried through the mails or in interstate commerce by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale when no registration statement was in effect as to those securities.

86.     Harkins and HWG, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to

offer to sell or offer to buy securities through the use or medium of an offering  document or otherwise, when no registration statement had been filed for those securities.

87.     By reason of the foregoing conduct, Harkins and HWG violated and, unless restrained and enjoined, will again violate Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Find that each Defendant committed the violations alleged in this Complaint;

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each Defendant from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

### III.

Order that Harkins and HWG disgorge any and all ill-gotten gains, together with pre-and post-judgment interest, derived from the improper conduct set forth in this Complaint;

### IV.

Order that each Defendant pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court, plus post-judgment interest;

### V.

Grant such other relief as this Court may deem just or appropriate.

## **JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.


Dated: August 26, 2019

Respectfully submitted,


*s/  Stephen C. McKenna*
Stephen C. McKenna
Terry R. Miller
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
(303) 844-1036 (McKenna)
(303) 844-1046 (Atkinson)
mckennas@sec.gov
millert@sec.gov