IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil Action No.:19-cv-02418-KMT


UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff

        v.

HARTMAN WRIGHT GROUP, LLC and

TYTUS W. HARKINS

    Defendants


---

## SEC'S MOTION FOR SUMMARY JUDGMENT ON SECTION 5 CLAIM

---

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................2

    A.  Loan Participations .........................................................................................3

    B.  6&25 Investments ...........................................................................................4

    C.  Corporate Notes...............................................................................................5

ARGUMENT ....................................................................................................................5

I.       THE SEC IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS'
        LIABILITY FOR SECTION 5 VIOLATIONS ........................................................6

    A.  No registration statement and interstate commerce ...........................................7

    B.  Defendants offered and sold securities...............................................................7

        1.  The Loan Participations are securities. ....................................................9

        2.  The 6&25 Investments are Securities. ................................................... 11

        3.  The Corporate Notes are securities. ........................................................13

    C.  Harkins was a necessary participant and substantial factor in

        HWG's offer and sale of securities. ..................................................................14

    D.  Defendants cannot establish a registration exemption. ......................................14

II.      THE SEC IS ENTITLED TO DISGORGEMENT ON SUMMARY
        JUDGMENT. ...........................................................................................................16

CONCLUSION................................................................................................................17

## Table of Authorities

**Federal Cases**                                                                                    **Page(s)**

*Adler v. Wal-Mart Stores*,
    144 F.3d 664 (10th Cir. 1998) ................................................................................... 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S.Ct. 1318 (2015) ............................................................................................... 6

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990) ........................................................................................... 7, 8, 11

*SEC v. Calvo*,
    378 F.3d 1211 (11th Cir. 2004) ................................................................. 6, 14, 16, 17

*SEC v. Edwards*,
    540 U.S. 389 (2004) ......................................................................................... 6, 8, 11

*SEC v. Holschuh*,
    694 F.2d 130 (7th Cir. 1982) .................................................................................... 14

*SEC v. Mahabub*,
    343 F. Supp. 3d 1022 (D. Colo. 2018) ........................................................................ 6

*SEC v. Mahabub*,
    411 F. Supp. 3d 1163 (D. Colo. 2019) ...................................................................... 16

*SEC v. Platforms Wireless Intern. Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ............................................................................. 14, 16

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953) ........................................................................................... 7, 14

*SEC v. Shields*
    744 F.3d 633 (10th Cir. 2014) ......................................................... 9, 11, 12-13

*SEC v. Thompson*,
    732 F.3d 1151–57 (10th Cir. 2013) ................................... 5, 6, 7, 8, 9, 10, 11, 12

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ............................................................................................ 7, 8

*World Trade Fin. Corp. v. SEC*,
    739 F.3d 1243 (9th Cir. 2014) .................................................................................. 15

**Federal Statutes**

15 U.S.C. § 77b ................................................................................................................ 8

15 U.S.C. § 77d ............................................................................................................... 15

15 U.S.C. § 77e (c) .......................................................................................... 6

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 1

D.C.COLO.LCivR 56.1 ...................................................................................1

**Other**

17 C.F.R. § 230.501 ........................................................................................ 15

17 C.F.R. § 230.503 ........................................................................................ 16

17 C.F.R. § 230.506 ........................................................................................ 15

Plaintiff Securities and Exchange Commission ("SEC") moves under Fed. R. Civ. P. 56 and D.C.COLO.LCivR 56.1 for summary judgment on the SEC's Third Claim for Relief: Offer and Sale of Unregistered Securities pursuant to Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") against Defendants Hartman Wright Group, LLC ("HWG") and Tytus W. Harkins ("Harkins"). *See* Doc. No. 1 at ¶¶ 83-87. This Motion is supported by the concurrently filed Declarations of Matthew Skidmore, attached as Exhibit A ("Skidmore Decl.") and Michael Hennigan, attached as Exhibit B ("Hennigan Decl."), and exhibits attached thereto.

## PRELIMINARY STATEMENT

From 2015 through 2017, investors gave HWG more than $8 million for a mobile home park business in exchange for three types of investment instruments, referred to below as "Loan Participations," "6&25 Investments," and "Corporate Notes," all of which were securities. Defendants employed a number of fraudulent devices to raise this money, including failing to make full and fair disclosures to potential investors when promoting the securities. Congress designed the registration requirements of the Securities Act to protect investors from this type of incomplete and misleading disclosures, but Defendants evaded these protections by failing to register the offerings of HWG's securities.

In this motion the SEC seeks summary judgment on its claim that HWG and Harkins violated Section 5 of the Securities Act by offering and selling HWG's securities in transactions for which no registration statement was filed or in effect (the "Section 5 claim"). There is no dispute that Defendants sold investments without registering the transactions. There is also no genuine factual dispute that the three types of investments sold by Defendants are securities. Granting summary judgment on the Section 5 claim will simplify the trial and allow the jury to

1

focus on the SEC's claims that Defendants employed fraudulent devices in peddling their unregistered securities to unwary investors.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  HWG is a limited liability company formed in Colorado with a previous principal place of business in Colorado Springs, Colorado. Skidmore Decl. at ¶ 4.

2.  Harkins was the owner and managing member of HWG during all times relevant to this case. *Id*. at ¶ 5.

3.  HWG did not file or have in effect any registration statement for the offers and sales of the Loan Participations, 6&25 Investments, or Corporate Notes. *Id*. at ¶ 6.

4.  HWG and Harkins offered and sold HGW's securities by communicating with prospective investors by telephone, emails transmitted over the Internet, a HWG website, and the mails, which are means or instrumentalities of interstate commerce. *Id*. at ¶ 9.

5.  HWG and Harkins offered and sold investments in Loan Participations (*id.* at ¶¶ 11-17); 6&25 Investments (*id.* at ¶¶ 18-21) and Corporate Notes to investors (*id.* at ¶¶ 22-25).

6.  Harkins controlled HWG during the offers and sales of HGW's securities, prepared the HWG's prospectus and marketing materials, and solicited investors. *Id*. at ¶ 7. HWG and Harkins offered and sold securities to non-accredited investors. *Id*. at ¶ 8.

7.  Defendants did not take reasonable steps to verify whether the investors were accredited. *Id*.

8.  Defendants acknowledge that at least some of the investments that they marketed were securities.  *Id*. at ¶ 10.

### A.      Loan Participations

9.      HWG raised money through "Loan Participations," which worked as follows: HWG purported to make a loan to a limited liability company created to own a mobile home park. The purported loan was reflected by a promissory note that provided HWG with the right to be repaid principal with interest, and was secured by a lien on real property (the mobile home park). *Id*. at ¶ 13.

10.      HWG offered investors a *pro rata* share of the HWG's interest in the promissory note—with investors to receive the right to repayment of principal and interest, and the lien on the real property in proportion to the size of their investment. *Id*. at ¶ 14.

11.      HWG pooled investors' funds into HWG's bank account regardless of which of the five different mobile home properties they invested in. *Id*. at ¶ 11.

12.      From 2015 to 2017, HWG offered and sold a total of $5,268,242.80 of Loan Participations to 20 investors in five different properties. *Id*.

13.      Investors expected to receive profits solely from the efforts of Harkin and HWG through their management and improvement of the five properties. *Id*. at ¶ 15.

14.      Defendants offered investors the Loan Participations to raise money for maintenance and capital improvements in mobile home parks. *Id*. at ¶ 12.

15.      Defendants offered and sold the Loan Participations to investors using general solicitation, including through mailing lists, finders, seminars, and its public website. *Id*. at ¶ 9.

16.      The Loan Participations were secured by real estate that was significantly over-encumbered, making the security for the participation loans much less of a risk-reducing factor. Hennigan Decl. at ¶ 8.

17.     HGW did not file a Form D for the Loan Participations with the Commission. Skidmore Decl. at ¶ 17.

**B.     6&25 Investments**

18.     Under the 6&25 Investments, HWG raised cash from investors to raise money for general business uses and to finance large acquisitions, namely to "facilitate the purchase, rehab and operations of" mobile home parks. *Id*. at ¶ 19.

19.     In exchange, HWG signed promissory notes in which it promised to pay annual returns of 6% on the amount invested and conveyed a 25% ownership interest in an entity that, according to HWG, would generate profits to be distributed to owners. *Id*.

20.     Defendants raised $1,790,001.00 from four investors through the 6&25 Investments for the purpose of purchasing and operating mobile home parks. *Id*. at ¶ 18.

21.     The 6&25 Investments are memorialized in part by a promissory note under which investors were entitled to an annual fixed-rate return of 6%. *Id*. at ¶ 20.

22.     Defendants marketed the 6&25 Investments to the general public by offering and selling these notes through mailing lists, finders, seminars, and its public website. *Id*. at ¶ 9.

23.     HWG characterized the 6&25 Investment instruments as an "investment." *Id*. at ¶ 18.

24.     HGW did not file a Form D for the 6&25 Investments with the Commission. *Id*. at ¶21.

25.     The 6& 25 Investments were secured by real estate that was significantly over-encumbered, making the security for the participation loans much less of a risk-reducing factor. Hennigan Decl. at ¶ 8.

### C.    Corporate Notes

26.    HWG offered corporate notes to raise money for the general use of its business enterprise and to "bolster [HWG's] cash reserves." *Id*. at ¶ 22.

27.    The investments typically paid 7.2% interest annually. *Id*.

28.    Investors gave HWG $1,586,000.00 between 2015 and 2017 for the Corporate Notes. *Id*. at ¶ 24.

29.    The Corporate Notes were part of a common enterprise in which multiple investors invested money in HWG. *Id*. at ¶¶ 22-24.

30.    Defendants sold the Corporate Notes to investors using general solicitation, including through finders and seminars. *Id*. at ¶ 9.

31.    HWG marketed the Corporate Notes in its prospectuses and in its presentations as investments in securities. The Promissory Note Subscription Agreement includes a page titled Important Notices and Legends that states: "THE SECURITIES OFFERED PURSUANT HERETO ARE SECURITIES AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAW OF ANY STATE OR ANY OTHER JURISDICTION." *Id*. at ¶ 23.

32.    HGW did not file a Form D for the Corporate Notes with the Commission. *Id*. at ¶ 25.

## ARGUMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *SEC v. Thompson*, 732 F.3d 1151, 1156–57 (10th Cir. 2013) (quotation omitted). On summary judgment the Court views the evidence in the light most favorable to the nonmoving party. *Id.* (quotation omitted). A factual

dispute is not "genuine" if the nonmovant "can do no more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted).

## I.     THE SEC IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANTS' LIABILITY FOR SECTION 5 VIOLATIONS.

Defendants violated Section 5 of the Securities Act by selling unregistered securities. Congress enacted the Securities Act to restore investors' confidence in the financial markets in response to "serious abuses in a largely unregulated securities market." *Thompson*, 732 F.3d at 1157 (cleaned up). The purpose of the securities laws is to regulate investments "in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). The Securities Act protects investors by ensuring that issuers of securities, like HWG, make full and fair disclosures to potential investors. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318, 1323 (2015). "The linchpin of the Act is its registration requirement." *Id.*

Section 5 of the Securities Act makes it "unlawful for any person, directly or indirectly" to offer or sell any security by means of interstate commerce unless a registration statement has been filed or is in effect. 15 U.S.C. § 77e(a) and (c). To establish a *prima facie* case for a violation of Section 5(a) and (c) of the Securities Act, the SEC must demonstrate that (1) no registration statement was filed or in effect; (2) the defendant, directly or indirectly, offered or sold a security; and (3) the offer or sale took place by means of interstate commerce. 15 U.S.C. § 77e(a) and (c); *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1039 (D. Colo. 2018). Section 5(a) and (c) impose strict liability on offerors and sellers of unregistered securities like Defendants— good faith arguments are not relevant. *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004). A person like Harkins violates Section 5 if he was a necessary participant or a substantial factor in the offering or selling. *Id*.

Once the SEC establishes a *prima facie* violation, the burden shifts to the defendants to demonstrate that the securities were exempt from the registration requirement. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126 (1953). In response to a *prima facie* violation of Sections 5(a) and 5(c), Defendants may not rest on conclusory allegations and bald assertions; they must do more than "simply show that there is some metaphysical doubt as to the material facts." *Thompson*, 732 F.3d at 1157 & 1162 ("[T]he non-movant's evidence that notes are not securities, if believed, must create a material amount of persuasion above equipoise, because it would have to be sufficient to overcome the presumption that all notes are securities.") (cleaned up).

### A.  No registration statement and interstate commerce

The first and third elements of a Section 5 claim are readily established. Defendants offered and sold three types of investments: (1) Loan Participations, (2) the 6&25 Investments, and (3) Corporate Notes. SOF 5. No registration statement was in effect for these investments, SOF 3, and Defendants used the means of interstate commerce in connection with the offer and sale of each of these investments, SOF 4.

### B.  Defendants offered and sold securities.

The issue whether the instruments sold by Defendants are securities can be resolved on summary judgment because the question of whether an instrument is a security is a question of law. *See, e.g.*, *Thompson*, 732 F.3d at 1160-61. ("[T]he ultimate determination of whether the note is a security is one of law…."). The three investments are securities under two independent tests: each investment is a "note" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990), and each is an "investment contract" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The tests for notes under *Reves* and investment contracts under *Howey* are independent tests used to establish that

an investment is a security; if the SEC satisfies one test the Court need not consider the other. *See Thompson*, 732 F.3d at 1170.

**"Notes" are securities under *Reves*.** Notes are presumed to be securities, *Reves*, 494 U.S. at 65-67, and the presumption can be rebutted only if the note is an instrument recognized not to be a security or if it bears a "family resemblance" to such an instrument, *Thompson*, 732 F.3d at 1159.[1] Four factors are assessed to determine whether or not notes are securities: (1) the motivations of the seller and buyer; (2) whether the note is an instrument in which there is "common trading for speculation or investment;" (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, reduces the risk of the instrument, thereby rendering the application of the federal securities laws unnecessary. *Reves*, 494 U.S. at 66. Courts consider the economic reality of the circumstance as opposed to formal definitions when applying this test. *Id.* at 65.

**"Investment Contracts" are securities under *Howey*.** Investment contracts also meet the definition of a "security." 15 U.S.C. § 77b(a)(1). An investment contract exists where (1) a person invests money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of the promoter or a third party. *Howey*, 328 U.S. at 298-99; *see*. An investment scheme promising a fixed rate of return can be an "investment contract," *Edwards*, 540 U.S. at 397, and the third prong of the *Howey* test is satisfied when the "efforts made by those other than the

---

[1] The following instruments are recognized as <u>not</u> securities: "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] ... notes evidencing loans by commercial banks for current operations." *Thompson*, 732 F.3d at 1159 (quoting *Reves*, 494 U.S. at 65).

investor are the ones which affect significantly the success or failure of the enterprise." *SEC v. Shields* 744 F.3d 633, 645 (10th Cir. 2014).

**1.      The Loan Participations are securities.**

Defendants offered the Loan Participations to raise money for maintenance and capital improvements in mobile home parks owned by limited liability companies ("LLC"). SOF 9-14. HWG represented to investors that it made a loan to a specific LLC purporting to operate a specific mobile home park through a promissory note in which the LLC agreed to repay principal and interest to HWG, and provided a lien upon real property to secure the loan amount. SOF 9. HWG offered investors a *pro rata* share of HWG's interest in the promissory note in proportion to the size of each investment in the pooled funds received from all investors who purchased the Loan Participation. SOF 10. In essence, HWG used the Loan Participations to raise money for improvements to mobile home parks, and the investors expected profits from the success of HWG's operation of the mobile home parks. From 2015 to 2017, HWG raised a total of $5,268,242.80 from the sale of Loan Participations to 20 investors in five different properties. SOF 12.  The Loan Participations are both "notes" and "investment contracts, as defined by *Reves* and *Howey*, and are thus securities.

**The Loan Participations are "Notes" under *Reves*.** The Loan Participations are fractional interests in promissory notes and therefore presumed to be securities. *Thompson*, 732 F.3d at 1159. They do not fall within one of the categories of instruments which are not securities, and application of the *Reves* factors supports the presumption that the Loan Participations are notes.

The first factor—the motivations of the seller and buyer—weighs in favor of the presumption because Defendants' purpose was to raise money for maintenance and capital

9

investments, while the investors were interested almost exclusively in the profit from the note. SOF 13 & 14. *Thompson*, 732 F.3d at 1162 ("If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'").

The second factor—common trading for speculation or investment—also supports the presumption that the notes are securities because Defendants sold the Loan Participations to 20 different investors using general solicitation, including through telephone, emails transmitted over the Internet, a HWG website, and the mails. SOF 4, 12, 15. *Thompson*, 732 F.3d at 1164-66 (finding this factor cut towards "securities" where the defendant sold notes through mailing lists, finders, seminars, and its website and "sought to sell its Instruments to anyone who could come up with" the purchase price). And, unlike the plan of distribution typical of non-security instruments where one lender (typically a bank) infuses cash into multiple borrowers, here multiple borrowers infused HWG with cash, which "resembles far more closely the activity of a company selling its own stock on an exchange." *Thompson*, 732 F.3d at 1167.

The third factor—reasonable perceptions of the investing public—weighs in favor of the presumption because investors thought the Loan Participations were investments and HWG marketed the Loan Participation as investments in its prospectuses, in its presentations, and on its website. SOF 9-15. *Thompson*, 732 F.3d at 1167.

Finally, the fourth factor—existence of an alternative regulatory scheme or other risk-reducing factors—weighs toward to the presumption that the notes are securities because no meaningful risk reducing factors exist. The Loan Participations are not the subject of another regulatory scheme that would reduce the risk of the instrument like the insurance provided by the

Federal Depository Insurance Corporation. *Reves*, 494 U.S. at 69. In addition, although the Loan Participations were secured by real estate, the promissory notes were secured by real estate that was significantly over-encumbered, making the security for the participation loans much less of a risk-reducing factor. SOF 16. Considering all four *Reves* factors, the Loan Participations are securities in the form of "notes."

  **The Loan Participations are "Investment Contracts" under *Howey*.** The first and second *Howey* factors are satisfied because the investors made an investment of money as part of a common investment scheme: the maintenance and capital improvements in mobile home parks. SOF 14. The third factor, expectation of profits from the promoter or a third party, is satisfied because investors were promised a fixed rate of return, a profit expected to be derived from the work of HWG—the investors were not responsible for or capable of the maintenance and improvement of mobile home parks. *Edwards*, 540 U.S. at 397; *Shields* 744 F.3d at 645.

  Accordingly, the SEC is entitled to summary judgment that the Loan Participations are securities under *Reves* and *Howey*.

    **2.  The 6&25 Investments are Securities.**

  In the 6&25 Investments, investors provided cash to HWG so that it could finance large acquisitions. SOF 18. In exchange, HWG promised to pay annual returns of 6% on the amount invested and conveyed a 25% ownership interest in an entity that, according to HWG, would generate profits to be distributed to owners according to the percentage of their ownership. SOF 19. These investments are securities because they are both "notes" and "investment contracts."

  **The 6&25 Investments are "Notes."** The 6&25 Investments are memorialized in part by a promissory note under which investors were entitled to an annual fixed-rate return of 6%, SOF 19 & 21, and are thus presumed to be securities. *Thompson*, 732 F.3d at 1159. The

instruments do not fit into the list of instruments which are not securities, *id.*, and similar to the analysis above, the application of the *Reves* factors does not overcome the presumption that the notes are securities.

The first *Reves* factor supports the presumption that the note is a security because HWG's motivation to sell the 6&25 Investments was to purchase and operate mobile home parks. SOF 19. The investors' motivation to buy the notes was the profit generated by the notes, which was represented to be 6% of the investment annually plus 25% of the profits derived from the mobile home park referenced in the note. SOF 20.

The remaining factors also support the presumption that the notes are securities: Defendants marketed the 6&25 Investments to the general public by offering and selling these notes through mailing lists, finders, seminars, and its website, SOF 22; HWG characterized the instruments as "investments" and no countervailing factors would lead a reasonable person to question HWG's characterization, SOF 23; and similar to the purported security behind the Loan Participations, the actual security provided by HWG for the 6&25 Investments was a sham and did little to reduce the risk of the investments in a way that resembles a non-security instrument. SOF 25. As a result, the investors were left with no meaningful recourse when HWG defaulted. The 6&25 Investments are securities in the form of "notes."

**The 6&25 Investments are "Investment Contracts."** The first and second *Howey* factors are satisfied because the investors made an investment of money ($2.27 million) in the 6&25 Investments as part of a common investment scheme (the purchase and operation of mobile home parks). SOF 20. The third factor is satisfied because investors were promised 25% of profits from a joint venture and the expected profits would be derived solely from the efforts of HWG. *See Shields* 744 F.3d at 645 (providing examples of when a venture interest can be a

security, including where the agreement provides little power to the investor to manage the venture and the investor is inexperienced and unknowledgeable in the venture's business).

Accordingly, the SEC is entitled to summary judgment that the 6&25 Investments are securities under *Reves* and *Howey*.

### 3.     The Corporate Notes are securities.

HWG offered corporate notes between 2015 and 2017 that typically paid 7.2% interest annually. SOF 26-27. HWG offered the notes to raise money for the general use of its business and to bolster cash reserves of the business. SOF 26. Investors invested $1,586,000.00 in the Corporate Notes. SOF 28. The Corporate Notes were part of a common enterprise in which multiple investors invested money in HWG. SOF 29. These Corporate Notes are securities because they are both "notes" and "investment contracts."

**The Corporate Notes are "Notes."** An analysis similar to those above establishes that the Corporate Notes are securities. As notes, they are presumed to be securities. They do not fit into the list of instruments that are not securities. The *Reves* factors all weigh in favor of the presumption that the notes are securities: (1) Defendants offered the Corporate Notes to raise money for the general use of its business enterprise, and the investors' purpose was primarily in the interest promised by the notes; (2) HWG sold the Corporate Notes to investors using general solicitation, including through finders and seminars; (3) investors thought the Corporate Notes were investments and HWG marketed the Corporate Notes in its prospectuses and in its presentations as investments; and (4) there was no other regulatory scheme or other risk-reducing aspect of the Corporate Notes that rendered the application of the federal securities laws unnecessary.

**The Corporate Notes are "Investment Contracts."** The Corporate Notes satisfy the first *Howey* factor because investors invested $1,586,000.00 in the HWG Corporate Notes. SOF

28. The Corporate Notes were part of a common enterprise in which multiple investors invested money in HWG to "bolster [HWG's] cash reserves for procuring property finance packages." SOF 29; Ex. 15 to Skidmore Decl. at p. 9. As with the other investments above, the expected profitability of the Corporate Notes was to be derived solely from the efforts of HWG. No investor played any role in generating any profits for the Corporate Notes.

Accordingly, the SEC is entitled to summary judgment that the Corporate Notes are securities under *Reves* and *Howey*.

### C.      Harkins was a necessary participant and substantial factor in HWG's offer and sale of securities.

Harkins is liable for violating Section 5 as a "necessary participant" or "substantial factor" in the offer or sale of the unregistered securities by being involved in the organization of the securities offering. *Calvo*, 378 F.3d at 1215*; SEC v. Holschuh*, 694 F.2d 130, 140 (7th Cir. 1982) (defendant's actions in details of plan to issue new securities created primary liability as participant). Harkins was the managing member of HWG. SOF 2. He prepared the offering materials and prospectuses for the Loan Participations, 6&25 Investments, and the Corporate Notes and prepared the offering information posted on the HWG website. SOF 6. He also solicited and offered the Loan Participations, 6&25 Investments, and the Corporate Notes. *Id*. Harkins was thus a necessary participant and substantial factor in HWG's sales of securities and, therefore, is liable for violations of Sections 5(a) and (c). *See Holschuh*, 694 F.2d at 140.

### D.      Defendants cannot establish a registration exemption.

To defeat summary judgment, Defendants bear the burden of proving that an exemption from registration applies because the SEC established the *prima facie* elements of Section 5 violations. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010). Because registration is so important to the

protection of the investing public, exemptions to registration requirements are construed

narrowly against the parties claiming their benefits." *World Trade Fin. Corp. v. SEC*, 739 F.3d

1243, 1247 (9th Cir. 2014). Accordingly, Defendants must produce evidence showing

entitlement to an exemption to survive summary judgment. Here, Defendants will not be able to

be able to establish any commonly cited exemptions.

Section 4(a)(2), for instance, provides Section 5 shall not apply to "transactions by an

issuer not involving a public offering." 15 U.S.C. § 77d(a)(1). HWG and Harkins cannot

establish this exemption because they engaged in general solicitation mailings, seminars where

the attendees were invited through a publicly available website, and employed finders to engage

individuals with whom Defendants had no prior relationship. SOF 4.

Another commonly cited exemption, Rule 506(c) of Regulation D, provides that "[o]ffers

and sales of securities by an issuer that satisfy the conditions [of this Rule] shall be deemed to be

transactions not involving any public offering within the meaning of Section 4(a)(2) of the

[Securities] Act." 17 C.F.R. § 230.506(a). Among other things, Rule 506(c) requires that

securities are sold only to accredited investors.[2] *Id*. The Rule further requires the issuer to take

reasonable steps to verify that the purchasers are accredited investors, such as reviewing tax

records, bank or brokerage statements and a consumer credit report. *Id*. § 230.506(b). In addition,

Rule 503(a) requires an issuer offering or selling securities under Rule 506 to file with the

Commission a notice of sales containing the information required by Form D (17 C.F.R.

---

[2] Under Rule 501(a), an "accredited investor" is defined as any person who comes within one of several categories, but includes a natural person whose net worth individually or with that person's spouse exceeds $1,000,000, excluding the value of the person's primary residence as an asset; or any person who had individual income in excess of $200,000 in each of the two most recent years or joint income with their spouse in excess of $300,000 in each of those years and a reasonable expectation of reaching the same income level in the current year. 17 C.F.R. § 230.501(a)(5) and (6).

§ 239.500) for each new offering of securities not later than 15 days after the first sale of securities in the offering. 17 C.F.R. § 230.503(a). This exemption is not available here because HWG and Harkins offered and sold securities to non-accredited investors, and neither HWG nor Harkins took reasonable steps to verify whether the investors were accredited. SOF 7. In addition, HWG did not file Forms D for its Loan Participations, 6&25 Investments and Corporate Notes, so they cannot claim an exemption under Rule 506. SOF 17, 24, 32.

## II.    THE SEC IS ENTITLED TO DISGORGEMENT ON SUMMARY JUDGMENT.

Disgorgement is designed to deprive Defendants of unjust enrichment and deter others from violating securities laws. *Platforms Wireless*, 617 F.3d at 1096. The Court has discretion to subject an owner-officer of a firm, like Harkins, to joint and several liability for disgorgement where the firm, like HWG here, receives gains through unlawful conduct and the owner collaborated and profited from the violations. *SEC v. Mahabub*, 411 F. Supp. 3d 1163, 1172-73 (D. Colo. 2019). Here, the SEC seeks an order that Defendants jointly and severally disgorge the amount Defendants obtained through the violations of Sections 5(a) and 5(c). *Calvo*, 378 F.3d at 1217 (ordering disgorgement of proceeds from Section 5 violation on summary judgment).

A disgorgement calculation requires only a "reasonable approximation of profits causally connected to the violations." *Id.* (quotation omitted). "[T]he amount of disgorgement should include all gains flowing from the illegal activities," which in the case of the offer and sale of securities in violation of Section 5 is measured by the amount of proceeds obtained from the illegal unregistered sale of securities. *Id.* Exactitude is not a requirement to calculate the disgorgement amount so long as the measure of disgorgement is reasonable. *Calvo*, 378 F.3d at 1217. "[A]ny risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id.* (quoting *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).

16

Defendants' own records show that they obtained $8,644,243.80 from the illegal unregistered sale of securities: (1) $5,268,242.80 obtained by sale of the Loan Participations; (2) $1,790,001.00 obtained by sale of the 6&25 Investments, and (3) $1,586,000.00 obtained by sale of the Corporate Notes. The burden thus shifts to Defendants to set forth "specific facts" from which the Court could calculate a different amount for disgorgement, *see Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998), but Defendants' "inadequate documentation and the complex and heavily disguised transactions employed" in their fraud will prevent them from meeting their burden here. *See Calvo*, 378 F.3d at 1217-18.

Finally, the SEC is entitled to prejudgment interest on all amounts ordered disgorged. Because the amount of prejudgment interest depends on the date judgment is entered, the SEC requests an order awarding prejudgment interest and directing the SEC to submit a proposed amount for the Court's consideration.

## **CONCLUSION**

For the reasons above, the SEC requests an order (1) finding that the Loan Participations, 6&25 Investments, and Corporate Notes are securities as a matter of law; (2) granting summary judgment that Defendants violation Sections 5(a) and (c) of the Securities Act; and (2) directing Defendants to disgorge $8,644,243.80 plus prejudgment interest in an amount to be determined after the date of the order.

Dated: May 4, 2020

Respectfully submitted,

*s/ Terry R. Miller*
Stephen C. McKenna
Terry R. Miller
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700

17

Denver, CO 80294-1961
(303) 844-1000
mckennas@sec.gov
millert@sec.gov

**Certificate of Service**

I hereby certify that on May 4, 2020, a copy of the foregoing was filed with the CM/ECF filing system and served on the following via email:

Tytus Harkins
Email: tharkins@hartmanwright.com

Hartman Wright Group, LLC
c/o Tytus Harkins
Email: tharkins@hartmanwright.com

*s/ Scott Wesley*
Contract Paralegal

19