IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19–cv–02418–PAB–KMT

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

HARTMAN WRIGHT GROUP, LLC, and
TYTUS W. HARKINS,

    Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Kathleen M. Tafoya**

Before the court is "SEC's Motion for Summary Judgment on Section 5 Claim," filed by Plaintiff United States Securities and Exchange Commission ["SEC"]. (["Motion"], Doc. No. 27.) Defendant Tytus W. Harkins ["Harkins"] has responded in opposition to the Motion, and the SEC has replied. (["Response"], Doc. No. 32; ["Reply"], Doc. No. 33.) No response has been filed by Defendant Hartman Wright Group, LLC ["HWG"], and the time to do so has lapsed.[1] For the following reasons, it is RECOMMENDED that the Motion be GRANTED.

---

[1] Defendant HWG has not retained counsel in this lawsuit, despite being advised in September 2019 that it could not represent itself. (*See* Doc. No. 9.) By failing to obtain counsel, Defendant HWG, a limited liability company, has failed to appear and defend itself in this case. *See Rowland v. Calif. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel.") (citations omitted). As such, the SEC's well-pleaded allegations against Defendant HWG are deemed admitted. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied.").

## STATEMENT OF THE CASE

Defendant Harkins is the owner and managing member of Defendant HWG, a Colorado limited liability company that invests in mobile home parks.  (Mot. Ex. A, ["Skidmore Declaration"] at ¶¶ 4-5, Ex. 1, Ex. 2 at 4-5 ¶¶ 17, 19.)  From 2015 through 2017, HWG offered and sold three types of financial instruments to its investors: (1) Corporate Notes; (2) Loan Participations; and (3) 6&25 Investments [collectively, the "HWG Instruments"].  (*Id.* at ¶¶ 11-25.)  Harkins, as the managing member of HWG, solicited potential investors, and prepared the prospectus and marketing materials relating to the HWG Instruments.  (*Id.* at ¶¶ 7-8, Ex. 4 at 66:12-67:25, 110:15-111:23, 164:23-165:6.)  The HWG Instruments were offered and sold through various means of interstate commerce, including via telephone, internet, and mail.  (*Id.* at ¶ 9, Ex. 4 at 88:19-89:7, Ex. 5, Ex. 6, Ex. 7.)  No SEC registration statement was ever filed, or in effect, for these sales.  (*Id.* at ¶ 6, Ex. 3.)  It is the SEC's position that Defendants engaged in a "Ponzi-like" scheme to defraud investors, and violated multiple provisions of the Securities Act of 1933 ["Securities Act"], 15 U.S.C. §§ 77a *et seq.*, and the Securities Exchange Act of 1934 ["Exchange Act"], 15 U.S.C. §§ 78a *et seq.*, through the offer and sale of the HWG Instruments. (["Complaint"], Doc. No. 1, at ¶¶ 1-7; Mot. 5.)

On August 26, 2019, the SEC commenced this civil enforcement action against Harkins and HWG, asserting three causes of action: (1) "Fraud in the Offer or Sale of Securities: Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];" (2) "Fraud in the Purchase or Sale of Securities: Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];" and (3) "Offer and Sale of Unregistered Securities: Sections 5(a) and (c) of the

Securities Act [15 U.S.C. § 77e(a) and (c)]." (Compl. ¶¶ 77-87.) The SEC now moves for summary judgment, solely on its third claim for relief.[2] (Mot. 5.)

## STANDARD OF REVIEW

### I. Pro Se *Defendant*

Defendant Harkins is proceeding *pro se*. The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding the allegations of a *pro se* litigant "to less stringent standards than formal pleadings drafted by lawyers"). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not "construct arguments or theories for [a *pro se* litigant] in the absence of any discussion of those issues." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991); *see Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (stating that a court may not "supply additional factual allegations to round out a plaintiff's complaint"). Defendant Harkin's *pro se* status does not entitle him to an application of different rules. *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

---

[2] In its motion for summary judgment, the SEC also requested an order "directing Defendants to disgorge $8,644,243.80 plus prejudgment interest in an amount to be determined after the date of the order." (Mot. 20-21.) However, the SEC later clarified its position "that the issue of the amount of disgorgement is more properly addressed during a proceeding on remedies where the Court will weigh the relevant evidence." (Doc. No. 34.) As such, the issue of disgorgement need not be addressed.

## II. Federal Rule of Civil Procedure 56

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law. *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160

4

(10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In evaluating a motion for summary judgment, a court may consider admissible evidence only.  *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010).  The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  *Concrete Works*, 36 F.3d at 1517.  However, this standard does not require the court to make unreasonable inferences in favor of the non-moving party.  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008).  The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

## ANALYSIS

### I. Section 5 of the Securities Act

The SEC contends that Defendants violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)], by offering and selling unregistered securities.  (Mot. 10.)  Section 5 of the Securities Act makes it unlawful for any person, "directly or indirectly," to offer or sell any security by means of interstate commerce, unless an SEC registration statement has been filed, or is in effect.  15 U.S.C. §§ 77e(a) and (c); *accord SEC v. Int'l Chem. Dev. Corp.*, 469 F.2d 20, 27 (10th Cir. 1972).

To establish a *prima facie* case for a violation of Section 5(a) or 5(c) of the Securities Act, the SEC must demonstrate: (1) the sale or offer to sell securities; (2) the absence of a valid

5

registration statement covering the securities; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer. *SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1039 (D. Colo. 2018) (citing *SEC v. Cont'l Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972)); *accord San Francisco-Okla. Petrol. Explor. Corp. v. Carstan Oil Co.*, 765 F.2d 962, 964 (10th Cir. 1985); *see* 15 U.S.C. §§ 77e(a) and (c). The SEC need not establish scienter. *Aaron v. SEC*, 446 U.S. 680, 714 n.5 (1980). Rather, Section 5 imposes strict liability upon any person who directly or indirectly violates its plain terms. *Anastasi v. Am. Petroleum, Inc.*, 579 F. Supp. 273, 274 (D. Colo. 1984) (citing *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980)). "Section 5 liability extends beyond those who sell stock in unregistered transactions to those who are 'both a necessary participant and substantial factor in the sales transactions.'" *SEC v. Parrish*, No. 11-cv-00558-WJM-MJW, 2012 WL 4378114, at *4 (D. Colo. Sept. 25, 2012) (quoting *SEC v. Phan*, 500 F.3d 895, 906 (9th Cir. 2007)) (alterations omitted). "The use of intermediaries between the seller and purchaser does not limit liability." *Id.* (citing *SEC v. Wolfson*, 539 F.3d 1249, 1261 n.19 (10th Cir. 2008)).

Once the SEC establishes a *prima facie* violation of Section 5, the burden shifts to the defendant to demonstrate that a claimed exemption from registration applies. *Busch v. Carpenter*, 827 F.2d 653, 656 (10th Cir. 1987) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)). Because "public policy strongly supports registration," any exemption from registration "must be strictly construed against the person claiming its benefits." *Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971) (citations omitted).

Here, Defendant Harkins does not dispute that all three HWG Instruments at issue—Corporate Notes, Loan Participations, and 6&25 Investments—were unregistered. (Resp. 3.)

6

Nor does Defendant Harkins appear to dispute that means of interstate commerce were used in connection with the offer and sale of the HWG Instruments, or that he, personally, was a "substantial factor" in the offer and sale of the HWG Instruments.  (*See id. generally*.)  Defendant Harkins argues, instead, that the HWG Instruments were not "securities," as that term is defined by the Securities Act.  (*Id.* at 1-3.)  Whether the SEC has established a *prima facie* violation of Section 5, therefore, depends exclusively upon whether the HWG Instruments qualify as "securities" within the meaning of the Securities Act.  *See Mahabub*, 343 F. Supp. 3d at 1039.

## II. *The Definition of a "Security" under the Securities Act*

The determination as to whether a particular instrument is a "security" is a question of law.[3]  *SEC v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013).  Section 2(a)(1) of the Securities Act defines a "security" as:

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest

---

[3] Defendant Harkins devotes significant portions of his Response brief to the assertion that HWG "generally did not sell securities," and he contends that this issue "must be able to be decided by a jury." (Resp. 1-2.)  However, it is well-settled that this issue is a matter of law.  *See SEC v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013) (rejecting argument that a jury should make the ultimate determination as to whether instruments were securities, in part, because the "Supreme Court's decisions in this area also suggest that, at least in the context of civil suits, the ultimate determination whether an instrument is a security is one of law"); *Ave. Cap. Mgmt. II, L.P. v. Schaden*, 131 F. Supp. 3d 1118, 1128 n.6 (D. Colo. 2015) ("It is a question of law whether plaintiffs have stated a claim that the LLC membership interests are securities under the Act.  Plaintiffs do not identify any factual disputes that would preclude determination of this question, and none are apparent to the Court.") (internal citation omitted).

>or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscript to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).  The overarching presumption, rooted in statutory law, is that a "security" includes "virtually any instrument that might be sold as an investment."  *SEC v. Edwards*, 540 U.S. 389, 393-94 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)); *Thompson*, 732 F.3d at 1157 ("Congress 'painted with a broad brush' in defining 'security,' so as to capture under the ambit of the [Securities] Acts the 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'") (citation omitted).  "[C]ourts inquiring into an instrument's status as a 'security' are not 'bound by legal formalisms,' but instead must 'take account of the economics of the transaction under investigation' in order to capture and effectuate the regulation of 'investments, in whatever form they are made and by whatever name they are called.'"  *Thompson*, 732 F.3d at 1158 (quoting *Reves*, 494 U.S. at 61) (alterations omitted).  It is well-settled that "form should be disregarded for substance and the emphasis should be on economic reality."  *Id.* (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

The SEC argues, here, that the HWG Instruments at issue—Loan Participations, Corporate Notes, and 6&25 Investments—qualify as either "notes" or "investment contracts," which are "securities," under the Securities Act.  (Mot. 11-20.)

### III. The HWG Instruments

#### A. An Overview

##### 1. Loan Participations

From 2015 through 2017, HWG raised a total of $5,268,242.80 through the sale of Loan Participations to twenty investors.  (Skidmore Decl. ¶ 11, Ex. 9, Ex. 10.)  Defendants offered and

sold Loan Participations to raise money for maintenance and capital improvements in connection with five separate mobile home park properties. (*Id.* at ¶ 12, Ex. 4 at 211:12-212:1, Ex. 11.) The Loan Participations were structured as follows: HWG would make a loan to a specific limited liability company ["LLC"], which would then purchase and operate a specific mobile home park. (*Id.* at ¶ 13, Ex. 9 at 1.) In exchange, HWG would receive a lien on the real property (*i.e.,* the mobile home park), as well as a promissory note from the LLC, in which the LLC agreed to repay principal and interest to HWG. (*Id.*) Defendants would then offer investors a *pro rata* share of HWG's interest in the promissory note and corresponding lien for a specific property— with investors to receive the right to repayment of the principal and interest on the loan, as well as the value of the lien, in proportion to the size of each investment in the pooled funds received from all investors who purchased a Loan Participation. (*Id.* at ¶ 14, Ex. 9 at 1.)

### 2. *6&25 Investments*

Under the 6&25 Investments, Defendants raised $1,790,001.00 from four investors to "facilitate the purchase, rehab and operations of" mobile home parks. (*Id.* at ¶¶ 18-19, Ex. 10, Ex. 13 at 3.) In exchange for the investors' cash, HWG signed promissory notes, in which it promised to pay each investor a fixed-rate return of six percent per annum. (*Id.* at ¶¶ 19-20, Ex. 14.) Each investor also received a twenty-five percent ownership interest in a joint venture that owned the mobile home park. (*Id.* at ¶ 19, Ex. 13 at 3.)

### 3. *Corporate Notes*

HWG offered Corporate Notes to raise money for the general use of its business enterprise, as well as to "bolster [HWG's] cash reserves." (*Id.* at ¶ 22, Ex. 15 at 9.) Between

2015 and 2017, investors collectively gave Defendants $1,586,000.00 for the Corporate Notes, which typically paid 7.2% interest annually. (*Id.* at ¶¶ 22, 24, Ex. 15 at 4, Ex. 10.)

### *B. Whether the HWG Instruments are "Notes"*

The SEC argues, first, that the HWG Instruments sold by Defendants are "notes" under §2(a)(1) of the Securities Act. (Mot. 13.) Generally, a note is "[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer." *Note*, BLACK'S LAW DICTIONARY (8th ed. 2004). Section 2(a)(1) of the Securities Act defines a "security" to include "any note." 15 U.S.C. § 77b(a)(1). However, it is well-settled that "the phrase 'any note' [as it appears in the Securities Acts] should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *SEC v. Thompson*, 732 F.3d 1151, 1158 (10th Cir. 2013) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990)) (alterations in original).

In *Reves v. Ernst & Young*, the United States Supreme Court detailed the proper approach to ascertain whether a "note" is a security under the Securities Act. *Id.* at 1159 (citing *Reves*, 494 U.S. at 64-65). Under the so-called "family resemblance" test, a note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note falls within, or "bears a strong resemblance" to, one of the following categories of instruments, which are "not securities":

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized) [,and] . . . notes evidencing loans by commercial banks for current operations.

*Id.* at 1159 (quoting *Reves*, 494 U.S. at 65, 67). In determining whether an instrument "bears a strong resemblance" to the instruments on that list, four factors must be considered: "(1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction; (2) the plan of distribution of the instrument with an eye on whether it is an instrument in which there is common trading for speculation or investment; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 1160 (quoting *Reves*, 494 U.S. at 66-67) (alterations and internal quotation marks omitted). "Failure to satisfy one of the factors is not dispositive; they are considered as a whole." *Id.* (quoting *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 2002)).

Here, as the SEC correctly points out, the Loan Participations are essentially fractional interests in promissory notes. (Skidmore Decl. ¶¶ 13-14, Ex. 9 at 1; *see* Mot. 13.) In addition, the 6&25 Investments and Corporate Notes were both memorialized by promissory notes, under which investors were entitled to annual fixed rates of return. (Skidmore Decl. ¶¶ 19-20, 22, Ex. 13-15.) As such, the HWG Instruments are "presumed" to be securities. *Reves*, 494 U.S. at 67. Further, it is clear that the HWG Instruments do not fall within one of the recognized categories of instruments deemed to be "non-securities." *Id.* at 66. Specifically, the HWG Instruments were not "delivered in consumer financing," "secured by a mortgage on a home," or "short-term" in duration. *Id.* at 65. Nor were the HWG Instruments related to a "character" loan to a bank customer, or to "an open-account debt incurred in the ordinary course of business." *Id.* Therefore, the court must apply the *Reves* four-factor analysis to determine whether the HWG

11

Instruments qualify as "securities" under the Securities Acts. *Thompson*, 732 F.3d at 1160, 1162-70.

### *1. Motivations of Buyer and Seller*

As to the first factor, the court must "examine the motivations that would prompt a reasonable buyer and seller of the [HWG] Instruments to enter into the transaction." *Id.* at 1162 (citing *Reves*, 494 U.S. at 66). "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. By contrast, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose," the note is "less sensibly" deemed to be a "security." *Id.* "The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994).

In this case, the uncontroverted record shows that Defendants offered and sold the HWG Instruments, primarily to raise money for HWG's general business operations relating to the acquisition, maintenance, and capital improvements of mobile home parks. (Skidmore Decl. ¶¶ 12, 19, 22, Ex. 4 at 211:13-212:1, Ex. 11, Ex. 13 at 3, Ex. 15.) It is, likewise, clear that investors entered into these transactions to earn profit. Specifically, the 6&25 Investments offered an annual interest rate of six percent, plus twenty-five percent of the profits derived from the mobile home park referenced in the promissory note, while the Corporate Notes promised investors annual returns of up to 7.2 percent. (*Id.* at ¶¶ 19-20, 22, Ex. 13 at 3, Ex. 14, Ex. 15); *see*

*Thompson*, 732 F.3d at 1162 (finding "the attractive interest rate the Instruments guaranteed" to be "strong evidence" that investors were motivated primarily by profit); *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998) ("[A] favorable interest rate indicates that profit was the primary goal of the lender."). Further, the record shows that investors who purchased Loan Participations "thought their passive investments in [those instruments] would be used to make improvements to the mobile home park in which they were investing." (Skidmore Decl. ¶¶ 15-16, Ex. 12 at 123:14-124:5.) From both sides, then, the Loan Participations are most naturally conceived as investments in a business enterprise, rather than as purely commercial or consumer transactions. Accordingly, the first factor supports a finding that the HWG Investments are securities. *See Solid Q Holdings, LLC v. Arenal Energy Corp.*, No. 2:15-cv-419-DN, 2018 WL 5268208, at *3 (D. Utah Oct. 23, 2018) (finding the first factor to support a finding that the transactions at issue involved "securities," where the seller "entered into these transactions for the purpose of raising money for its general business operations," and where the buyer "entered into these transactions to earn a profit"); *c.f. Foxfield Villa Assocs., LLC v. Robben*, 309 F. Supp. 3d 959, 974-75 (D. Kan. 2018) (finding the first factor to weigh against a finding that the loan at issue was a security, where the loan "was intended to finance FVA's short-term cash-flow issues" and "was intended to be repaid within a short time-frame," and where the investor's "primary interest was in his new venture succeeding," rather than "profit on the loan").

### 2. *Plan of Distribution*

The second *Reves* factor requires the court to analyze "the plan of distribution" of the HWG Instruments to determine whether they are instruments in which there is "common trading for speculation or investment." *Thompson*, 732 F.3d at 1164 (quoting *Reves*, 494 U.S. at 66). If

13

an instrument is "offered and sold to a broad segment of the public," then "common trading" is established. *Id.* (quoting *Reves*, 494 U.S. at 68). "[T]he sale of the notes on an exchange is not necessary to establish the requisite common trading." *Id.* (citing *Reves*, 494 U.S. at 66). However, "an evident interest in widening the scope of distribution, combined with the broad availability of the notes can tip this factor strongly in favor of classifying the note as a security." *Id.* (quoting *SEC v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002)) (internal quotation marks omitted).

Here, the record shows that Defendants marketed the HWG Instruments, by means of general solicitation, through mailing lists, finders, seminars, and HWG's public website. (Skidmore Decl. ¶ 9, Ex. 4 at 88:19-89:7, Ex. 5, Ex. 6, Ex. 7.) The HWG Instruments were ultimately sold to multiple investors, at least some of whom were non-accredited individual investors. (*Id.* at ¶ 8, Ex. 4 at 164:23-165:6, Ex. 10.) Such investors unquestionably "have a legitimate need for protection by securities laws." *SEC v. Global Telecom Servs., LLC*, 325 F. Supp. 2d 94, 115 (D. Conn. 2004); *accord Stoiber v. SEC*, 161 F.3d 745, 752 (D.C. Cir. 1998) (finding the second factor to suggest a security, where the notes were sold to "individuals, not sophisticated institutions"). These facts are consistent with a broad investment plan, as opposed to a single commercial loan transaction.[4] *See Wallenbrock*, 313 F.3d at 539 (finding the second

---

[4] In his Response, Defendant Harkins argues that "these loans were not for common trading or speculation," and also that "no speculation on these positions [was even] possible as there was no trading." (Resp. 3.) Harkins claims that HWG's investors "made loans understanding [the] long-term placement due to its real estate backing," and he insists that "every lender was briefed on the 'illiquid' nature of their loan." (*Id.*) Harkins also argues that "these loans were NOT sold by mailing lists, finders, etc. as the SEC claims," and he contends that "[a]ny other assertion is a complete mischaracterization of such events." (*Id.*) However, Defendant has produced no evidence to support these assertions. *Thompson*, 732 F.3d at 1161-62 (holding that, once the movant puts forth evidence showing that a note is a security, "the non-movant must make a

14

factor to weigh "strongly in favor of classifying the note as a security," where the seller "put no limitation on who could purchase the notes, offering them to any member of the general public who could make the investment and provide his name, address, and social security number"); *Foxfield Villa Assocs.*, 309 F. Supp. 3d at 975 (finding the second factor to weigh against classifying a note as a security, where the loans at issue "were not solicited from the public or even anyone outside the FVA membership").  As such, the second factor also weighs in favor of categorizing the HWG Instruments as securities.

### 3. *Reasonable Expectations of the Investing Public*

The third factor addresses "the reasonable expectations of the investing public." *Reves*, 494 U.S. at 66.  This factor "generally turns on whether [the notes] are reasonably viewed by purchasers as investments." *Thompson*, 732 F.3d at 1167 (quoting *Stoiber*, 161 F.3d at 751) (alterations in original).  Here, the court finds that a reasonable investor would view the HWG Instruments as investments, given that Defendants explicitly characterized them as such, in its prospectuses, presentations, and website.  (Skidmore Decl. ¶¶ 18, 23, Ex. 13 at 3 ("Investor will receive 6% interest on all their principle during their holding period."), Ex. 15 at 7 ("THE SECURITIES OFFERED PURSUANT HERETO ARE SECURITIES[.]").  Therefore, this factor also supports a finding that the HWG Instruments are securities. *See Stoiber*, 161 F.3d at 751 ("When a note seller calls a note an investment, in the absence of contrary indications it would be reasonable for a prospective purchaser to take the [seller] at its word.") (citation and alterations omitted).

---

showing sufficient to establish that the note is *not* a security").  Further, to the extent Harkins argues that the HWG Instruments were never traded, the "transferability" of a note "is not necessary to establish the requisite common trading." *Id.* at 1164.

### *4. Reduction of Risk*

Finally, the court must assess whether there are adequate "risk-reducing factors," such as "an alternative regulatory scheme," that would "significantly reduce[] the risk of the instrument" to the investor, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67.  Here, there are no "risk-reducing factors," which weigh against finding the HWG Instruments to be securities.  Indeed, the HWG Instruments were neither insured, nor covered by any alternative regulatory scheme to protect investors.  Further, the record shows that the Corporate Notes were not collateralized, at all.  (*See* Skidmore Decl. ¶ 22, Ex. 15 at 4-14.)  As such, the Corporate Notes "would escape federal regulation entirely if the [Securities] Acts were held not to apply."  *Thompson*, 732 F.3d at 1168 ("If the instrument 'would escape federal regulation entirely if the [Securities] Acts were held not to apply,' the fourth factor cuts toward characterizing the instrument as a security."); *see Reves*, 494 U.S. at 68 ("[W]e find no risk-reducing factor to suggest that these instruments are not in fact securities.  The notes are uncollateralized and uninsured.").

Although the Loan Participations and 6&25 Investments were each secured by real property, the SEC has submitted evidence to show that that the subject properties were significantly over-encumbered, making the security for those instruments much less of a risk-reducing factor.  (Mot. Ex. B, ["Hennigan Declaration"] at ¶ 8, Ex. 1.)  Defendant Harkins, on the other hand, contends that the SEC's property valuations demonstrate "a GROSS misunderstanding" of HWG's "business."  (Resp. 2.)  Harkins has produced his own evidence to show that at least some of the HWG Instruments were fully secured, and that those investors "received payoffs of their loans as anticipated."  (*Id.*, Ex. 1.)  In light of the parties' competing

summary judgment evidence, the court finds the final factor to be neutral. *See Tripodi v. Capital Concepts, LLC*, No. 2:09-CV-00071-CW, 2014 WL 2967941, at *7 (D. Utah July 1, 2014) (finding that the existence of collateral "provided at best limited security for the investors," where "[a]ll investors were on equal footing and there was no limit on the number of investors whose notes may have been secured by the same collateral"); *SEC v. Smart*, 2011 WL 2297659, at *15 (D. Utah June 8, 2011) (finding the fourth factor to suggest that the notes at issue were securities, where among other things, there was "no real, valuable collateral securing any of the notes, other than a note that appears to already have been in default").

Therefore, considering the *Reves* factors together, the court finds that the HWG Instruments are "notes" that qualify as "securities" under the Securities Act.[5] *See Thompson*, 732 F.3d at 1160 (explaining that *Reves* factors should be considered "as a whole"). As such, the HWG Instruments are subject to Section 5's registration requirements. 15 U.S.C. § 77e(a) and (c); *Busch v. Carpenter*, 827 F.2d 653, 656 (10th Cir. 1987). Because the record shows that the HWG Instruments were unregistered, as well as offered and sold through means of interstate commerce, the SEC has established a *prima facie* violation of Section 5. *See San Francisco-Okla. Petrol. Explor. Corp. v. Carstan Oil Co.*, 765 F.2d 962, 964 (10th Cir. 1985). Given that Defendant Harkins has neither argued, nor produced evidence to show, that an exemption applies, the SEC is entitled to summary judgment on this claim. *See SEC v. Gordon*, 522 F. App'x 448, 450-51 (10th Cir. 2013) (affirming summary judgment on a Section 5 claim, where

---

[5] The SEC argues, in the alternative, that the HWG Instruments qualify as "investment contracts" under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). (Mot. 11.) Because the court finds that the HWG Instruments are securities as "notes" under *Reves*, there is no need to address whether they are also securities as "investment contracts" under *Howey*. *See Thompson*, 732 F.3d at 1170.

17

the defendant "failed to carry his burden of showing an applicable exemption to cover his sales of unregistered securities").

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that "SEC's Motion for Summary Judgment on Section 5 Claim" (Doc. No. 27) be **GRANTED**.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both

timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 30th day of November, 2020.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge