IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-02418-PAB-MDB

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

TYTUS W. HARKINS,

     Defendant.

---

## ORDER

---

This matter is before the Court on the Motion to Dismiss Notwithsatanding [sic] the Verdict Under Rule 50 [Docket No. 98] filed by defendant Tytus W. Harkins and Plaintiff United States Securities and Exchange Commission's Motion for Remedies and Final Judgment [Docket No. 99]. The Securities and Exchange Commission ("plaintiff" or "SEC") responded to Mr. Harkins's motion, Docket No. 100, and Mr. Harkins replied. Docket No. 103. Mr. Harkins responded to the SEC's motion, Docket No. 101, and the SEC replied. Docket No. 102. Former defendant Hartman Wright Group ("HWG") did not respond.

## I.  BACKGROUND[1]

On August 26, 2019, the SEC filed this action against Mr. Harkins and HWG.

---

[1] The Court assumes the parties' familiarity with the background facts and procedural history of this dispute. Additional information may be found in previous orders and recommendations. *See, e.g.*, Docket Nos. 35, 47.

*See* Docket No. 1.[2]  The SEC brought three claims in this case: (1) fraud in the offer or sale of securities in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); (2) fraud in the purchase or sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (3) the offer or sale of unregistered securities in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c).  *Id.* at 19–22, ¶¶ 77–87.

The SEC moved for summary judgment on its third claim, Docket No. 27, which the magistrate judge recommended the Court grant.  Docket No. 35.  The Court granted the SEC's motion over Mr. Harkins's objections and entered summary judgment for the SEC on its Section 5 claim against Mr. Harkins and HWG.  Docket No. 47.[3]  On February 22, 2022, the SEC moved for default judgment against HWG, which had failed to appear.  Docket No. 54.  The magistrate judge recommended that the Court enter default judgment against HWG, Docket No. 74, which recommendation the Court accepted without objection.  Docket No. 75.

From April 4 to April 14, 2022, the Court held a jury trial on the SEC's remaining claims against Mr. Harkins.  Docket Nos. 82–89.  At the close of the SEC's case, Mr. Harkins moved for judgment as a matter of law pursuant to Federal Rule of Civil

---

[2] Mr. Harkins is the owner and managing member of HWG.  Docket No. 47 at 2. The Court refers to Mr. Harkins and HWG together as "defendants."

[3] HWG did not object to the recommendation.  *See id.* at 1. The magistrate judge explained that, because HWG did not retain counsel and Mr. Harkins, as a non-lawyer, cannot represent it, HWG failed to appear.  Docket No. 35 at 1 n.1.  As such, the magistrate judge deemed admitted the SEC's allegations against HWG under Federal Rule of Civil Procedure 8(b)(6).  *Id.*

Procedure 50(a), which the Court denied.  *See* Docket No. 86; Unofficial Tr., Apr. 11, 2022 at 86–91.  Mr. Harkins did not make any motions at the close of his case. Unofficial Tr., Apr. 12, 2022 at 145.  The jury found that Mr. Harkins violated Sections 17(a)(2) and (a)(3) of the Securities Act as well as Section 10(b)(5) of the Exchange Act and Rule 10b-5, but did not violate Section 17(a)(1).  Docket No. 94 at 1–2.  After the trial, Mr. Harkins filed a motion styled as a motion to dismiss notwithstanding the verdict, Docket No. 98, and the SEC has moved for remedies.  Docket No. 99.

## II.  MR. HARKINS'S MOTION

Mr. Harkins makes four arguments in his motion for judgment notwithstanding the verdict:[4] (1) the jury's verdict on Section 17(a)(1) and Section 17(a)(3) is inconsistent; (2) the jury's verdict on Section 17(a)(1) and Rule 10b-5 is inconsistent; (3) the jury's verdict on Section 17(a)(2) and Rule 10b-5 is inconsistent; and (4) the Court should set aside the verdict because of the SEC's unethical conduct.  Docket No. 98 at 1–4.

Rule 50 provides that judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1); *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1156 (10th Cir. 2022) ("Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the

---

[4] "A motion denominated as a motion for directed verdict or for judgment notwithstanding the verdict should be treated as a motion for judgment as a matter of law."  *Lewis v. Powers*, No. 15-cv-02692-MEH, 2019 WL 4736458, at *1 (D. Colo. Sept. 27, 2019) (citing Fed. R. Civ. P. 50 advisory committee notes on 1991 amendment), *aff'd sub nom. Lewis v. City of Littleton*, 855 F. App'x 448 (10th Cir. 2021) (unpublished).

nonmoving party's position." (quoting *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d
1199, 1216 (10th Cir. 2013))).  Where a party properly moves for judgment as a matter
of law prior to the case being submitted to the jury, that party may renew the motion
after the jury returns its verdict.  *See* Fed. R. Civ. P. 50(a)(2), (b).  However, the Court
should grant such relief "only where the proof is all one way or so overwhelmingly
preponderant in favor of the movant so as to permit no other rational conclusion."  *Hinds
v. Gen. Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993).  "The renewed motion
under Rule 50(b) cannot assert grounds for relief not asserted in the original
motion."  *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 738–39 (10th Cir.
2007).

At the close of the SEC's case, Mr. Harkins made an oral motion pursuant to
Rule 50(a), arguing that the SEC had not proven that he acted with recklessness or
negligence, which are the relevant mental states necessary for liability under the
particular securities laws.  *See* Unofficial Tr., Apr. 11, 2022 at 86.  Thus, Mr. Harkins's
Rule 50(a) argument was limited to questioning the sufficiency of the evidence.  In his
post-trial motion, however, Mr. Harkins makes no arguments regarding the sufficiency of
the evidence to support the jury's verdict.  *See generally* Docket No. 98.  Rather, Mr.
Harkins argues that the jury's verdict was inconsistent and that the SEC committed
misconduct.  *Id.*  Because Mr. Harkins's renewed motion rests on different grounds than
his pre-deliberation motion, Mr. Harkins has waived any challenge to the sufficiency of
the jury's evidence, and the Court may not consider his new arguments.  *See Perez v.
El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) ("Arguments presented in a Rule
50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion.").

Thus, to the extent Mr. Harkins seeks to use Rule 50(b) to set aside the jury's verdict based on insufficient evidence, the Court will deny his motion. *See Marshall*, 474 F.3d at 738–39; *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1265 (10th Cir. 2016) (noting that compliance with Rule 50 is "mandatory" (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006))); *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1131 (10th Cir. 2019) ("In order to preserve for appeal an argument challenging the sufficiency of the evidence, the movant *must* raise the same argument in both a Rule 50(a) and a Rule 50(b) motion." (citing *Unitherm*, 546 U.S. at 399–402 ("Otherwise, an appellate court is 'without power' to grant relief under Rule 50."))).

The Court next considers whether Mr. Harkins may object to alleged inconsistencies in the jury's verdict. Because Mr. Harkins is proceeding *pro se*, the Court reviews his pleadings liberally without acting as his advocate. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A new trial because of an inconsistent verdict is not granted "lightly." *Johnson v. Ablt Trucking Co. Inc.*, 412 F.3d 1138, 1143 (10th Cir. 2005).[5] "When reviewing claims that a jury verdict is inconsistent, [the reviewing court] must accept any reasonable view of the case that makes the jury's answers consistent." *Loughridge v. Chiles Power*

---

[5] Mr. Harkins asks for the Court to "grant a judgement [sic] of not liable on all issues." Docket No. 98 at 4. The Tenth Circuit has made clear, however, that the proper remedy for an inconsistent jury verdict is a new trial, not a judgment as a matter of law. *Cf. Danner v. Int'l Med. Mktg., Inc.*, 944 F.2d 791, 794 (10th Cir. 1991) (holding that trial judge should have granted new trial, rather than judgment notwithstanding the verdict, because the judge could not know in what order the jury reached its inconsistent verdicts); *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 854 (10th Cir. 2000) ("We will not intrude on the province of the jury; therefore, a new trial is required.").

*Supply Co.*, 431 F.3d 1268, 1275 (10th Cir. 2005) (quoting *Heno*, 208 F.3d at 852).

Mr. Harkins failed to object to the alleged inconsistency in the verdict before the jury was discharged. *See* Unofficial Tr., Apr. 14, 2022 at 1–7. The Court must first determine whether this constitutes waiver. The Tenth Circuit has held that a "failure to object to general jury verdicts on the ground of inconsistency before the jury is discharged constitutes waiver, unless the verdict is inconsistent on its face such that the entry of judgment upon the verdict is plain error." *Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1545 (10th Cir. 1993) (citing *Hinds,* 988 F.2d at 1047). "However, when the verdicts are special verdicts[,] a party is not required to object to the inconsistency before the jury is discharged in order to preserve that issue for a subsequent motion before the district court." *Id.* (citing *Bonin v. Tour W., Inc.,* 896 F.2d 1260, 1263 (10th Cir. 1990)).

The Court must first determine whether the verdict in this case was a general verdict or a special verdict. "[T]he hallmark of a general verdict is that it requires the jury to announce the 'ultimate legal result of each claim.'" *Johnson*, 412 F.3d at 1142 (quoting *Zhang v. Am. Gem. Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003)). "A special verdict, by contrast, presents the jury with specific questions of fact." *Id.* The verdict form in this case asked the jury to determine whether the SEC proved, by a preponderance of the evidence, its two claims. *See* Docket No. 94. On the first claim under Section 17(a), the verdict form asked whether the SEC proved a violation of Section 17(a)(1), Section 17(a)(2), and/or Section 17(a)(3). *Id.* at 1. For the second claim, the verdict form asked whether the SEC proved its second claim. *Id.* at 2. Because the verdict form did not "present[] the jury with specific questions of fact," it

was a general verdict form.  *See Johnson*, 412 F.3d at 1142.

Mr. Harkins does not direct the Court to a place in the record where he lodged an objection to the alleged inconsistency before the jury was dismissed, and the Court finds none.  *See* Unofficial Tr., Apr. 14, 2022 at 1–7.  The Court therefore must determine whether "the verdict is inconsistent on its face so that the entry of judgement on the verdict is plain error."  *See Hinds*, 988 F.2d at 1047 (citation omitted).  "A verdict that resolves separate and distinct causes of action in favor of both parties is not inconsistent on its face."  *Harris Market Research v. Marshall Marketing & Comm., Inc.*, 948 F.2d 1518, 1522 (10th Cir. 1991).

Mr. Harkins identifies three alleged inconsistencies.  First, he argues that the jury's finding of no liability under Section 17(a)(1) is inconsistent with its finding of liability under Section 17(a)(3) because, according to Mr. Harkins, if he "did not 'employ any device, scheme, or artifice to defraud'" under Section 17(a)(1), "he obviously could not also[] 'engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser'" under Section 17(a)(3).  Docket No. 98 at 1.  Second, Mr. Harkins argues that the jury's finding that he was not liable under Section 17(a)(1) is inconsistent with its finding that he is liable under Section 10(b) and Rule 10b-5, given that both require the same mental state, scienter.  *Id.* at 2.  Third, Mr. Harkins argues that the jury's finding that he was liable under Section 17(a)(2) is inconsistent with its finding that he is also liable under Section 10(b) and Rule 10b-5 because those require different mental states, as negligence suffices for liability under Section 17(a)(2), while liability under Section 10(b) and Rule 10b-5 requires scienter.  *Id.*

The Court does not find the jury's verdict to be "inconsistent on its face," *see*
*Hinds*, 988 F.2d at 1047, because, as the SEC notes, the sections and subsections that
the SEC charged have different elements and prohibit different conduct.  *See* Docket
No. 100 at 5–10.  In *SEC v. Quan*, as in this case, the jury found the defendant "liable
under Section 10(b) and Rule 10b-5, and also liable under Section 17(a)(2)–(3), but not
liable under Section 17(a)(1)."  2014 WL 4670923, at *4 (D. Minn. Sept. 19, 2014), *aff'd*,
817 F.3d 583 (8th Cir. 2016).  The court found that the jury's findings "can be
harmonized by interpreting the jury's verdict as finding that [d]efendants did not employ
a fraudulent scheme, which is prohibited under Rule 10b-5(a) and Section 17(a)(1), but
[d]efendants did make a material misrepresentation or omission, which is prohibited
under Rule 10b-5(b) and Section 17(a)(2), and did engage in fraudulent business
practices, which are prohibited under Rule 10b-5(c) and Section 17(a)(3), and
[d]efendants did act with scienter.  This rationale by the jury would have resulted in
liability . . . for violating Rule 10b-5, no liability . . . for violating Section 17(a)(1), and
liability . . . for violating Sections 17(a)(2) and (3)."  *Id.*  Given the similarity in the jury's
verdict in that case, the Court finds the analysis in *Quan* to be persuasive and is a
"reasonable view of the case that makes the jury's answers consistent."  *See*
*Loughridge*, 431 F.3d at 1275.

Moreover, the Court does not agree with Mr. Harkins that any of the alleged
inconsistencies that he has identified are actually inconsistencies.  First, the jury's
finding that Mr. Harkins did not violate Section 17(a)(1), but did violate Section 17(a)(3),
is not inconsistent.  Those two sections prohibit different conduct, and the jury could
have found that Mr. Harkins did not use a device, scheme, or artifice to defraud, but did

engage in a transaction, practice, or course of business which operated as a fraud or deceit.  Additionally, Section 17(a)(1) requires scienter, while Section 17(a)(3) requires negligence.  The jury could have found that Mr. Harkins's used a device, scheme, or artifice to defraud and engaged in a transaction, practice, or course of business which operated as a fraud or deceit, but that he acted only negligently, which would have resulted in Section 17(a)(3) liability, but not Section 17(a)(1) liability.  Thus, the jury's finding that Mr. Harkins was not liable under Section 17(a)(1), and yet was liable under Section 17(a)(3), is not "inconsistent on its face so that the entry of judgment upon the verdict is plain error."  *See Hinds*, 988 F.2d at 1047.

The Court considers Mr. Harkins's second and third alleged inconsistencies together and determines that the jury's verdict that Mr. Harkins did not violate Section 17(a)(1), but did violate Section 10(b) and Rule 10b-5, is not inconsistent; nor is the verdict that Mr. Harkins violated Section 17(a)(2) inconsistent with its finding that he violated Section 10(b) and Rule 10b-5.

Although Section 17(a)(1) and Section 10(b)/ Rule 10b-5 have the same mental state, they prohibit different conduct.  Section 17(a)(1) makes it illegal "to employ any device, scheme, or artifice to defraud."  15 U.S.C. § 77q(a)(1).  Rule 10b-5 prohibits the same thing in subsection (a), but also prohibits, in subsections (b) and (c), respectively, "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  The jury could have found that Mr. Harkins engaged

in the conduct prohibited in Rule 10b-5(b) or 10b-5(c), but not the conduct specified in Rule 10b-5(a).  *See, e.g.*, *Quan*, 817 F.3d at 589 ("[T]he straightforward inference from the verdicts is that the jury concluded Quan made a false statement or misleading omission, but did not do enough beyond that (at least with scienter) to rise to the level of employing a device, scheme, or artifice to defraud." (citing *Anheuser–Busch, Inc. v. John Labatt Ltd.,* 89 F.3d 1339, 1347 (8th Cir. 1996) ("As the unchallenged instructions of the District Court make clear, the two claims have different elements.  In these circumstances, the jury could have found that [the plaintiff] proved all of the elements of [one claim] while failing to prove one of the separate elements of the [other claim].")).

As to the jury's verdict on Section 17(a)(2) and Section 10(b) and Rule 10b-5, the jury could have found that Mr. Harkins, with scienter, made a misstatement or omission of material fact, under Section 17(a)(2), and also made an untrue statement of a material fact or omitted to state a material fact under Rule 10(b)(5).  There is nothing inconsistent with these two verdicts.[6]

Moreover, because Section 17(a) is a "separate and distinct causes of action" from Section 10(b) and Rule 10b-5, *see Harris*, 948 F.2d at 1522, there is no facial inconsistency in the jury's verdicts, especially given that the SEC's complaint does not specify a subsection of Section 17(a), and the Court need not "address whether the verdicts were, in fact, inconsistent."  *See Resol. Tr. Corp.*, 998 F.2d at 1547 n.12.  Mr. Harkins therefore waived his second and third objections because they were not raised

---

[6] Mr. Harkins relies on *SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011). Docket No. 98 at 2.  The SEC argues that numerous courts have rejected *Kelly*'s reasoning.  Docket No. 100 at 9–10.  *Kelly* is not binding on this Court and did not concern consistency in a jury verdict like the one in this case or in *Quan*.

prior to the discharge of the jury.  *See id.* at 1547 ("Given that there is no facial

inconsistency between the verdicts, the district court could not be expected to notice, in

the absence of an objection, that there was a potential inconsistency.  [The movant] has

therefore waived this objection because it was not raised prior to the discharge of the

jury." (citing *Hinds*, 988 F.2d at 1047).

Mr. Harkins's final argument is that the Court should set aside the verdict

because of the SEC's unethical conduct.  Docket No. 98 at 3.[7]  Mr. Harkins argues that

the SEC attorney's closing argument was an "impassioned plea to hold [Mr.] Harkins

liable for lying all through the case," but that was the "duty of the [j]ury to decide."  *Id.*

Mr. Harkins argues that the SEC attorney violated Colorado Rule of Professional

Conduct 3.4(e), which states, in relevant part, that a lawyer shall not

> in trial, allude to any matter that the lawyer does not reasonably believe is
> relevant or that will not be supported by admissible evidence, assert
> personal knowledge of facts in issue except when testifying as a witness,
> or state a personal opinion as to the justness of a cause, the credibility of
> a witness, the culpability of a civil litigant or the guilt or innocence of an
> accused.

Colo. RPC 3.4(e).[8]

---

[7] Mr. Harkins asserts that 28 U.S.C. § 530B applies to the SEC's attorneys.
Docket No. 98 at 3.  That section subjects "[a]n attorney for the [g]overnment" to "[s]tate
laws and rules, and local [f]ederal court rules, governing attorneys in each [s]tate where
such attorney engages in that attorney's duties, to the same extent and in the same
manner as other attorneys in that [s]tate."  28 U.S.C. § 530B(a).  Although the SEC
does not argue that it is exempt from these rules, § 503B does not clearly apply to the
SEC.  That section cites to 28 C.F.R. § 77.2(a) for the definition of "attorney for the
government."  Section 77.2(a), however, does not list attorneys for the SEC.

[8] With exceptions inapplicable here, this District has adopted the Colorado Rules
of Professional Conduct ("Colo. RPC" or "Colorado Rules") as its standard of
professional conduct.  *See* D.C.COLO.LAttyR 2(a); *Hsin-Yi Wu v. Colo. Reg'l Ctr.
Project Solaris LLLP*, No. 19-cv-02443-RM-STV, 2020 WL 6044318, at *2 (D. Colo. Oct.
13, 2020).

Mr. Harkins argues that the attorney for the SEC violated Colo. RPC 3.4(e) in stating that Mr. Harkins was "lying and stealing – 'just like robbing a bank' – bringing in a criminal element into this civil case" in closing arguments that Mr. Harkins could not rebut.  Docket No. 98 at 3.  He insists that this "inflamed the jury's ability to overlook [sic] the clear instructions given by the [C]ourt."  *Id.*

As the SEC notes, in his closing argument, Mr. Harkins stated,

> [W]hen your company is going down, now everybody is gone, now we say it wasn't a one man show with our company at the beginning.  At the end it essentially was.  I could have inked myself and those circumstances I mentioned $1.4 million worth of gain.  I would never do anything like that, I have integrity, I couldn't do that.  But I don't think there could be any paper trail to check that.  It was sitting there.  Never could I do something like that.  Never have I sought to deceive and defraud people.

*See* Unofficial Tr., Apr. 13, 2022 at 46–47.  The SEC responded in rebuttal,

> His defense is also that at the end I could have stolen even more and not left a paper trail.  I couldn't have been committing fraud because I didn't steal even more, I didn't commit even more fraud.  Does that even make sense?  It is like a bank robber say I passed three banks on the way before I robbed this one.  His defense that he could have gotten away with more fraud is not at all a defense, it is the fraud that you saw, the evidence proved he committed.

*See id.* at 66.

The Court agrees with the SEC that its rebuttal did not "state a personal opinion as to . . . the credibility of a witness [or] the culpability of a civil litigant."  *See* Colo. RPC 3.4(e).  Thus, the Court does not find that the SEC attorney violated Colo. RPC 3.4(e).

"[C]ourts must exercise great caution in setting aside a jury's verdict due to an improper argument."  *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019) (quoting *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1168 (10th Cir. 2017) (quotations omitted)).  "Even if some statements exceeded the bounds of permissible

argument, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict." *Id.* (quoting *Racher*, 871 F.3d at 1168). "Four factors bear on whether attorney misconduct merit[s] a new trial: (1) the pervasiveness of the misconduct, (2) the taking of curative action, (3) the size of the verdict, and (4) the weight of the evidence." *Osterhout v. Bd. of Cnty. Comm'rs of LeFlore Cnty.*, 10 F.4th 978, 991–92 (10th Cir. 2021) (citing *Whittenburg v. Werner Enters., Inc.*, 561 F.3d 1122, 1127 (10th Cir. 2009) (first three factors); *Burke*, 935 F.3d at 1027 (balancing the weight of the evidence)). "The ultimate question is whether the attorney misconduct 'influenced the verdict.'" *Id.* at 992 (quoting *Racher*, 871 F.3d at 1161).

Mr. Harkins addresses none of these factors. *See* Docket No. 98 at 3. Although the Court reviews his pleadings liberally, the Court cannot act as his advocate. *See Haines*, 404 U.S. at 520–21; *Hall*, 935 F.2d at 1110. As to the first factor, the Court agrees with the SEC that this one stray remark, in response to Mr. Harkins's defense that he could have committed more fraud, is not pervasive misconduct. *See* Docket No. 100 at 12 (citing *Burke*, 935 F.3d at 1026 ("[A] stray improper remark in closing is no basis for upsetting a trial and requiring the parties and district court to redo their ordeal.")).

Second, the SEC is correct that the Court repeatedly told the jurors that arguments by counsel are not evidence. *See id.* (citing Unofficial Tr., Apr. 4, 2022 at 107–08 ("What is said in the closing arguments is not evidence."); *id.* at 108 ("Statements and arguments as opposed to sworn testimony are not evidence in the case unless made as an admission or stipulation of fact."); *id.* ("Just to be clear, the following things are not evidence: [s]tatements and arguments.")). Such instructions

weigh against Mr. Harkins's argument.  *See Osterhout*, 10 F.4th at 992 ("Curative

action.  This factor weighs against the grant of a new trial because the district court

instructed the jury that lawyers' statements are not evidence.").  Additionally, Mr.

Harkins did not object.  *See Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 962

(10th Cir. 1993) ("[A] party may not wait and see whether the verdict is favorable before

deciding to object. . . .  Unless the fairness of the trial is threatened, we therefore will not

exercise our discretion to review a challenge not raised by a timely objection.").

The third factor is neutral, as the Court has not, at this stage, determined the size

of liability or damages.  *See Osterhout*, 10 F.4th at 991–92.

The Court agrees with the SEC that the fourth factor, namely, the weight of the

evidence, *see id.*, weighs against Mr. Harkins's argument, as the verdict was not a total

victory for the SEC because the jury found that the SEC did not prove that Mr. Harkins

violated Section 17(a)(1).  Moreover, the evidence presented in this trial was

substantial.  This indicates that not only did the jury carefully consider the evidence, but

the jury was not greatly influenced by the SEC attorney's rebuttal argument.

Considering Mr. Harkins's claims of attorney misconduct cumulatively, *see id.* at

993 (citing *Rodgers v. Hyatt*, 697 F.2d 899, 902 (10th Cir. 1983)), the Court finds that

the "misconduct was not pervasive, any prejudice was cured, and the evidence was

strong."  *See id.*  Accordingly, the Court will deny Mr. Harkins's motion.

## III.  THE SEC'S MOTION

The SEC argues that defendants should be ordered to disgorge their net profits,

including pre-judgment interest, pay civil penalties, and be enjoined from future

violations of the securities laws.  *See generally* Docket No. 99.  Mr. Harkins opposes

disgorgement and civil penalties, but does not oppose an injunction.  *See generally* Docket No. 101.  The Court considers each of the SEC's requested remedies.

### A.  Disgorgement and Prejudgment Interest

The SEC argues that defendants, jointly and severally, should be ordered to disgorge their net profits and prejudgment interest, which the SEC intends to distribute to victims.  Docket No. 99 at 8–12.

"Generally, disgorgement is a form of '[r]estitution measured by the defendant's wrongful gain.'"  *Kokesh v. SEC*, 137 S. Ct. 1635, 1640 (2017) (alteration in original) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. a)). "Disgorgement is not a remedy provided for in the Securities Act or Exchange Act, but is instead a remedy the SEC routinely seeks through district courts' inherent equity jurisdiction."  *SEC v. Mahabub*, 411 F. Supp. 3d 1163, 1169 (D. Colo. 2019) (citing *Kokesh*, 137 S. Ct. at 1640), *aff'd sub nom. SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022).  The Supreme Court has explained that, although disgorgement is not mentioned in the securities acts, "courts determined that the SEC had authority to obtain what it called 'restitution' and what in substance amounted to 'profits' that 'merely depriv[e]' a defendant of 'the gains of . . . wrongful conduct.'"  *Liu v. SEC*, 140 S. Ct. 1936, 1940–41 (2020) (quoting *SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1307–08 (2d Cir. 1971)).  "Over the years, the SEC has continued to request this remedy, later referred to as 'disgorgement,' and courts have continued to award it."  *Id.* (quoting *Tex. Gulf Sulphur*, 446 F.2d at 1307–08).  The Tenth Circuit has characterized disgorgement as "remedial rather than punitive."  *GenAudio*, 32 F.4th at 944 (citing *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006) ("The district court has broad discretion not

only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."); *SEC v. Cavanagh*, 445 F.3d 105, 116 & n.25 (2d Cir. 2006) (noting that "[b]ecause the remedy is remedial rather than punitive, the court may not order disgorgement above" "the amount of money acquired through wrongdoing")).  The Court in *Liu* concluded that a "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [35 U.S.C.] § 78u(d)(5)."  *Liu*, 140 S. Ct. at 1940.

"Disgorgement need only be a reasonable approximation of profits causally connected to the violation."  *GenAudio*, 32 F.4th at 945 n.22 (quoting *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (alteration in original)).  "Once a reasonable approximation is shown, 'the burden shifts back to the defendant[s] to demonstrate that the disgorgement figure [is] not a reasonable approximation.'"  *Id.* (quoting *SEC v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014); citing *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) ("The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains. . . .  Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." (quotation and alteration omitted)).

The SEC argues that a reasonable approximation of defendants' net profits causally connected to their wrongdoing is $5,779,908.38.  Docket No. 99 at 9.  The SEC explains that amount is equal to defendants' "gross pecuniary gain less appropriate deductions for which there is adequate support in the record[]."  *Id.*[9]

---

[9] According to the SEC, defendants' "gross pecuniary gain" includes the total

The SEC identifies $8,707,825.80 as defendants' gross pecuniary gain from the investments they sold, $318,587.39 as returned to investors, and $2,609,330.03 in legitimate business expenses. *Id.* at 9–10. Mr. Harkins does not appear to contest the SEC's calculation of defendants' gross pecuniary gain as $8,707,825.80, but he does dispute the SEC's calculation of his net profits after deductions. *See* Docket No. 101 at 4 ("Given their calculation of gross gains as approximately $8.7M, their calculations of net profits are mistaken.").[10]

### 1. Disgorgement

Based on the records that defendants made available to the SEC, the SEC

---

sum of money that defendants raised from their investments. *See id.* There is support for the SEC's position in *Mahabub*. In that case, like this one, the defendants, among other things, sold unregistered securities in violation of 15 U.S.C. §§ 77e(a), (c). *See SEC v. Mahabub*, 343 F. Supp. 3d 1022, 1039 (D. Colo. 2018); *see also* Docket No. 47. At the remedies phase, the court in *Mahabub* considered the defendants' ill-gotten gains as "the amounts earned in the securities offerings infected by the misleading statements, which (in this case) is the same as the amounts earned from selling unregistered securities" and noted that the court did not need to "distinguish between unregistered securities offerings and securities offerings infected by misrepresentations." *Mahabub*, 411 F. Supp. at 1172. As discussed below, however, *Liu*, which was decided after *Mahabub*, requires courts to deduct legitimate expenses, such as salaries for employees and payments to vendors unconnected to the wrongdoing. *See Liu*, 140 S. Ct. at 1950 (citing Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. h, at 216 (reciting the general rule that a defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement)).

[10] Mr. Harkins first argues that "[a]ll information produced to investors was correct, when viewed in a logical and appropriate context." Docket No. 101 at 2. Mr. Harkins insists that "[d]efendants did not lie to investors" and attempts to characterize his "projects" as "value-add" investments. *See id.* at 2–3. These arguments, which are the same that Mr. Harkins's unsuccessfully made at trial, are without merit, given the jury's verdict, and the Court will not consider them further. The Court also does not consider any arguments that Mr. Harkins purports to make on behalf of HWG. As the Court has noted in other orders, Mr. Harkins, a non-lawyer, cannot represent HWG or appear on its behalf.

calculates that $318,587.39 was returned to investors, which the SEC has deducted

from its disgorgement approximation.  Docket No. 99 at 10 (citing Docket No. 99-12 at

4, ¶ 15).  The SEC also deducted $2,609,330.03 in legitimate business expenses.  *See*

*id.* (citing Docket No. 99-12 at 6, ¶ 25).

The SEC attaches a declaration of Michael Hennigan, a financial analyst, to its

motion.  Mr. Hennigan, who assisted in the SEC's investigation of defendants and who

testified at trial, believes that HWG's records reflect that some investors were paid

interest from the specific mobile home parks that they invested in.  *See* Docket No. 99-

12 at 3, ¶ 10.  Mr. Hennigan refers to these investors as "direct" investors.  *See id.* at 2,

¶ 4.  Other investors invested through participation notes, and others received returns

from corporate notes in HWG that the investors purchased.  *Id.*[11]  Mr. Hennigan

estimated the amount that each investor received from seven specific entities – (1)

Country Estates; (2) Farr Road; (3) Loblolly Estates; (4) North Park Manor; (5) Pine

Tree; (6) Rosewood; and (7) Pleasant Hills.  *Id.* at 3, ¶ 10; *see also id.* at 2, ¶ 5.[12]  Mr.

---

[11] The SEC has described three kinds of investments – loan participations;
"6&25" investments, which Mr. Hennigan calls "direct" investments; and corporate
notes.  *See* Docket No. 47 at 2.  The Court explained that, for the loan participations,
HWG made a loan to an LLC created to own a mobile home park.  *Id.*  The loan was
secured by a lien on the park and was reflected by a promissory note that provided
HWG the right to repayment with interest.  *Id.*  HWG offered investors a pro rata share
of HWG's interest in the promissory note and gave investors the right to repayment of
the principal and interest and the lien on the property.  *Id.*  For the 6&25 investments,
HWG raised money from investors for general business purposes and to finance and
"rehab" mobile home parks.  *Id.* at 3.  In exchange, HWG signed promissory notes,
promising to pay annual returns of 6% on the amount invested and conveying a 25%
ownership interest in an entity that HWG said would generate profit.  *Id.*  HWG also
offered corporate notes to raise money for general business purposes and to increase
its cash reserves.  *Id.* at 3–4.  The notes paid 7.2% annually.  *Id.*

[12] Mr. Hennigan states that HWG's financial records are incomplete and notes
that, although the SEC had access to HWG's QuickBooks records during the

Hennigan concluded that defendants returned $190,230.81 in debt service to direct investors, $107,186.61 in debt service payments to participation investors, and $21,169.97 in corporate note payments to investors, for a total of $318,587.39.  *Id.* at 4, ¶ 15.

Mr. Harkins does not dispute the SEC's calculation that defendants returned $318,587.39 to investors.  Docket No. 101 at 8.  Rather, Mr. Harkins insists that more money from various properties and investments was returned to investors and the SEC should have deducted those additional amounts.  *Id.* ("While conceding that the SEC's calculations interest of $318,587.39 and expenses of $2,609,330.03 are workable/agreeable amounts, the addition of $374,015.86 + $1,747,198.97 + $364,635.16 + $3,799,689.59 = $6,285,539.58 should be deducted from the gross amount of $8,707,825.80.").

### a.  Pleasant Hill, Country Estates, and HWG Corporate Notes

Mr. Harkins concedes that Pleasant Hill and Country Estates were "foreclosed and saw a total loss" and therefore "could not be deducted from the gross amount as it was lost and not returned."  *Id.* at 6.  Mr. Harkins also concedes that $1,600,000.00 in corporate notes were "not repaid" because HWG "folded."  *Id.* at 4.  The Court does not address these investments further.

### b.  North Park Manor, Rosewood, and Loblolly Estates

Mr. Harkins argues for greater deductions for North Park Manor, Rosewood, and

---

investigation, the SEC lost access at some point.  *Id.* at 2, ¶ 8.  According to a declaration from an attorney representing a former HWG executive in private litigation in the District of Oregon, Mr. Harkins reported that HWG stopped paying for access to QuickBooks and lost the data.  *See* Docket No. 99-13 at 2, ¶ 2.

Loblolly Estates.  *Id.* at 6–8.  First, Mr. Harkins argues that North Park Manor was sold for a "partial return" and that $374,015.86 was "proceeds going to lender payoffs."  *Id.* at 6.  Mr. Harkins provides what he represents is the settlement statement for the North Park Manor closing.  *See* Docket No. 101-1.  Second, Mr. Harkins argues that Rosewood was sold for a "gain" and identifies a trial exhibit that he says shows two loan payoffs, one for $957,398.97 and one for $684,800.00.  Docket No. 101 at 7.  Mr. Harkins asserts that the payoff was "sent to escrow with our real estate attorney" and provides what he says is an "[e]scrow [l]edger" from a law firm, showing "the full repayment of principle [sic] and interest to all Rosewood lenders."  *Id.*  Third, Mr. Harkins argues that Loblolly Estates was sold in 2018 and "the lenders there carried back a loan in that sale," which was paid off on June 19, 2020 and which returned $364,635.16 to lenders.  *Id.*

As the Court has noted, the SEC's burden at this stage is to show a "reasonable approximation" of defendants' wrongful gain.  *See GenAudio*, 32 F.4th at 945 n.22.  That gain, however, must only be "causally connected" to *violations* of securities laws, not investor losses.  *See id.* at 953;[13] *see also SEC v. AmeriFirst Funding, Inc.*, 2008

---

[13] The SEC argued on appeal in *GenAudio* that "the district court 'acted within its discretion in concluding that the profits from the two offerings infected by [defendants'] fraud were subject to disgorgement'" and that the court "was under no requirement to link specific investor payments to specific misrepresentations in order to arrive at its calculation."  *Id.* at 952–53 (defendants' argument "mistakes the requirement that disgorgement – which is measured by the defendant's wrongful gain – be 'causally connected' to *the violation*, with the requirement in a *private* securities suit for the injured investors seeking damages as redress to prove reliance and injury.").  The Tenth Circuit agreed.  *See id.* at 953.  The district court noted the "well-established principle that the SEC, as a government agency, need not prove that a securities buyer or seller relied on, and was injured by, a violator's misleading statements."  *Id.* at 953 (citing *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) ("Once the [SEC] has established that a defendant has violated the securities laws, the district court possesses the equitable

WL 1959843, at *2 (N.D. Tex. May 5, 2008) ("In the context of an offering of securities in violation of the securities laws, the proper starting point for a disgorgement award is the total proceeds received from the sale of the securities." (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972)).   Mr. Harkins may rebut the SEC's showing only by demonstrating that the SEC's disgorgement figure is not a "reasonable approximation" of defendants' wrongful gain.   *See id.*   The risk of uncertainty falls on the wrongdoer "whose illegal conduct created the uncertainty."   *See Teo*, 746 F.3d at 105 (quoting *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997)).

The SEC provides multiple responses to Mr. Harkins's arguments.   Docket No. 102.   First, the SEC argues that Mr. Harkins fails to show that any additional investor returns reduced defendants' net profits.   *Id.* at 5–6.   Because disgorgement is remedial, rather than punitive, and is measured by "the amount of money acquired through wrongdoing," not necessarily the amount of investor loss, *see GenAudio*, 32 F.4th at 945, 952–53 (quoting *Cavanagh*, 445 F.3d at 116 n.25), even if Mr. Harkins is correct that some investors received proceeds from the sale of North Park, Rosewood, and

---

power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by [the] fraud.  Whether or not any investors may be entitled to money damages is immaterial.") (quoting *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985))); *see also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (noting that the "primary purpose of disgorgement is not to compensate victims or punish the wrongdoer, but rather 'to prevent wrongdoers from unjustly enriching themselves through violations,' and thereby deter subsequent fraud" (quoting *Cavanagh*, 445 F.3d at 117)); *Tome*, 833 F.2d at 1096 (noting that a court's disgorgement award may exceed investor loss).  Thus, *GenAudio* explained, *Maxxon* "'generally describes some of the defendant's misrepresentations but never connects them to any particular securities transactions,' and [the Tenth Circuit] upheld the district court's disgorgement order in that case 'without [a] hint of disapproval,' even though the court 'had calculated disgorgement based on all profits from stock sales over a particular time period.'"  *GenAudio*, 32 F.4th at 953 (quoting *Mahabub*, 411 F. Supp. 3d at 1171).

Loblolly Estates, *see* Docket No. 101 at 6–7, Mr. Harkins has not shown that these payments to investors decreased defendants' net profits.[14]  For instance, Mr. Harkins's argument regarding North Park Manor is three short sentences with no argument or explanation of how the sale of the property decreased defendants' profits.  *See id.* at 6.  Mr. Harkins's similar discussion of Rosewood and Loblolly also fails to show that investor payments decreased defendants' profits.  *See id.* at 6–7.

Second, the SEC argues that Mr. Harkins "double-counts" some of the deductions that he proposes.  Docket No. 102 at 6.  Although the SEC's response is not entirely clear, Mr. Hennigan's declaration appears to reflect that the $318,587.39 that the SEC describes as "funds returned to investors" only accounts for interest payments.  *See* Docket No. 99-12 at 3, ¶ 10 ("It appears from HWG's records that investors in the Direct Investments and Participation Investments were paid interest from the specific park entities they invested in.  Investors in the Corporate Notes appear to have been paid interest by HWG."); *id.* at 4, ¶ 15 (reflecting "Debt Service Payments to Direct Investors" of $190,230.81; "Debt Service Payments to Participation Investors" of $107,186.61; and "Payments to Corporate Note Investors" of $21,169.97, totaling $318,587.39).

Mr. Hennigan, however, classified other amounts paid to investors, for instance

---

[14] Mr. Harkins argues that the "closing statement" for North Park Manor, for instance, reflects $374,015.86 in "proceeds going to lender payoffs," *see* Docket No. 101 at 6, yet there is no indication that the closing statement was admitted into evidence, and Mr. Harkins provides no evidence that any of these funds actually went to investors, and, with one exception, there was no evidence at trial that any lender was repaid.  *See* Docket No. 102 at 7.  The exception is Leslie Rants, who testified that she received approximately $164,000.00 of the $415,000.00 she invested in North Park Manor when that property was sold.  *See* Unofficial Tr., Apr. 6, 2022 at 214–15.

proceeds from sales of parks, as HWG business expenses because those payments appeared on HWG's statements of cash flow.  *Id.*, ¶ 18; *id.* at 5, ¶ 20 ("I allocated the Total Business Uses of Funds", which includes operating expenses and "Balance Sheet Based Use of Funds," "for each mobile home park entity to direct investor funds available after deduction of investor funds returned to investors. . . .  The total amount of business expenses allocated to direct investor funds is $1,768,719.62, and is reflected in Exhibit D.").  Exhibit D to Mr. Hennigan's declaration confirms that the "Business Uses of Funds Attributed to 6 & 25 Investor Funds" includes, for instance, $400,946.85 for North Park Manor, which appears to be Ms. Rants's full $415,000.00 investment minus the $14,053.15 interest that Ms. Rants received.  *See id.* at 7; *id.* at 15.  Thus, the SEC has shown that it already counted as expenses some of the very amounts that Mr. Harkins now seeks to classify as returns to investors.  Mr. Harkins has not shown that the SEC's classification of amounts paid to investors – whether interest payment returns or HWG expenses – or the SEC's calculation of those amounts was unreasonable, or that the SEC failed to account for certain money that went to investors.

Third, the SEC argues that the "evidence" Mr. Harkins offers in support of his proposed deductions do not establish that the SEC's calculation is unreasonable.  Docket No. 102 at 7–8.  For instance, Mr. Harkins purports to identify a settlement statement reflecting $347,015.86 "going to lender payoffs."  *See* Docket No. 101 at 6 (citing Docket No. 101-1).  However, Mr. Harkins does not indicate that this document was admitted into evidence during the trial and, even if it were, there is no indication that the money Mr. Harkins says went to investors actually did.

Mr. Harkins also identifies two purported "loan payoffs" reflected on Trial Exhibit

34, *see* Docket No. 101 at 7, yet Mr. Harkins provides no evidence that what he claims were payoffs actually went to investors.  Mr. Harkins provides what he identifies as an "[e]scrow [l]edger" from his law firm, *see id.* (citing Docket No. 101-2), yet there is no indication that document, dated October 26, 2018, was admitted at trial and subjected to the adversarial process, which could have given it more weight in the Court's consideration.  The Court finds that the SEC's disgorgement approximation was reasonable with respect to Pleasant Hill, Country Estates, and the HWG Corporate Notes, as well as North Park Manor, Rosewood, and Loblolly Estates.  Mr. Harkins has not shown otherwise, and any uncertainty in the SEC's disgorgement figure is resolved against Mr. Harkins.  *See Calvo*, 378 F.3d at 1217.

Ultimately, Mr. Harkins has failed to meet his burden to show that the SEC's approximation of profits with respect to North Park Manor, Rosewood, and Loblolly Estates was unreasonable.  *See, e.g.*, *Teo*, 746 F.3d at 107–08 ("[I]t was the Appellants' burden to provide the District Court with evidence that the SEC's approximation of profits was unreasonable.  This burden is not simply one of carrying the ball back across the fifty-yard line by presenting a merely plausible alternative explanation for the profit.  Rather, the defendant must adduce – at a minimum – specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue, the market valuation of the stock at fixed points in time, and any other cause for the profits they assert were untainted by illegality.  In so doing, they must account for the ambiguities, uncertainties and myriad market forces inherent to any analysis of fluctuations in stock pricing to credibly demonstrate the unreasonableness of the government's proposed disgorgement.").

### c.  Farr Road

Mr. Harkins argues that, because the Farr Road property was deeded to some investors "as a complete settlement," the value of that transaction should be deducted from the SEC's disgorgement approximation.  Docket No. 101 at 7–8.  Mr. Harkins represents that, on May 8, 2019, Road Too Far, LLC[15] purchased all of HWG's assets and liabilities associated with Farr Road and conveyed those assets, amounting to $3,799,689.59, to investors.  *Id.* at 8.

As with the other properties, Mr. Harkins has not shown that the transfer of Farr Road to some investors decreased defendants' profits.  Under the asset purchase agreement, the investors or buyers and seller exchanged assets of purportedly equal value.  *See* Docket No. 102 at 4 (citing Docket No. 102-1 (Trial Exhibit 16)).  The investors assumed a $3,220,000.00 "debt from Farr Road Holdings Group to Hartman Wright."  *See* Docket No. 101-4 at 1, Docket No. 101-5 at 1.  As the SEC explains, assuming that the documents Mr. Harkins provides are accurate,[16] the seller "received a benefit worth $3.8 million in the form of decreased liabilities in exchange for the assets it conveyed to the buyer," meaning that, "unlike a distribution to investors that would decrease owner's equity, the exchange of assets for an equivalent transfer of liabilities

---

[15] Witnesses testified at trial that Road Too Far, LLC is composed of five investors in Farr Road.  *See, e.g.*, Unofficial Tr., Apr. 12, 2022 at 30–31.

[16] The SEC argues that the documents Mr. Harkins provides may not be accurate because the closing statement shows an asset called "Farr Road Real Estate" worth $2,571,540.59, *see* Docket No. 101-5, yet the evidence at trial was that Farr Road was first acquired for $850,000.00.  *See* Trial Exhibit 16; Docket No. 102-1 at 2.  It is unlikely that this property increased in value from $850,000.00 to $2,571,540.59 between June 2015 and May 2019, given the testimony that Farr Road was a "dumping ground" and "horrible dumping site."  *See* Unofficial Tr., Apr. 7, 2022 at 11–12, *id.* at 89.

did not increase or decrease [d]efendants' net profits." *See* Docket No. 102 at 4.
Ultimately, Mr. Harkins has not shown that the SEC's determination is not a "reasonable
approximation of profits causally connected to the violation." *See GenAudio*, 32 F.4th at
945 n.22.

### 2. Legitimate Business Expenses

The SEC identifies $2,609,330.03 in legitimate business expenses. *See* Docket
No. 99 at 10 (citing Docket No. 99-12 at 6, ¶ 25). Mr. Harkins does not argue that this
figure is inaccurate or unreasonable. *See* Docket No. 101 at 8 ("[C]onceding that the
SEC's calculations interest of $318,587.39 and expenses of $2,609,330.03 are
workable/agreeable amounts.").

Accordingly, the Court will order defendants to disgorge $5,779,908.38.

### 3. Joint-and-Several Liability

The SEC argues that the Court should impose the disgorgement figure jointly
and severally among Mr. Harkins and HWG. Docket No. 99 at 11. The Supreme Court
in *Liu* noted that courts have "pushed the bounds of disgorgement" by, among other
things, "imposing joint-and-several disgorgement liability." *SEC v. Camarco*, 2021 WL
5985058, at *13 (10th Cir. Dec. 16, 2021) (unpublished) (second quotation to *Liu*, 140
S. Ct. at 1945 ("Equity courts also generally awarded profits-based remedies against
individuals or partners engaged in concerted wrongdoing, not against multiple
wrongdoers under a joint-and-several liability theory.")). However, *Liu* did not entirely
foreclose joint-and-several liability, which is available when "partners engaged in
concerted wrongdoing." *Liu*, 140 S. Ct. at 1949. As the SEC notes, courts after *Liu*
have continued to order "a person who controls an entity to disgorge the illegitimate

funds received by that entity."  *See SEC v. Owings Grp., LLC*, 2021 WL 1909606, at *4 (D. Md. May 12, 2021) (citing *SEC v. North Star Finance, LLC*, 2019 WL 3860321, at *10 (D. Md. Aug. 15, 2019); *SEC v. Yang*, 2021 WL 1234886, at *9 (C.D. Cal. Feb. 16, 2021); *SEC v. Smith*, 2020 WL 6712257 (C.D. Cal. Oct. 19, 2020); *SEC v. Curative Biosciences, Inc.*, Case No. 8:18-cv-00925-SVW-E, Docket No. 177, at 10, 13 (C.D. Cal. Oct. 22, 2020)).

The SEC argues that the Court should order disgorgement to be paid jointly and severally on Mr. Harkins and HWG because "[n]either [Mr.] Harkins nor HWG could have accomplished their fraud without the help of the other. . . .  [Mr.] Harkins could not have disguised property valuations and the misuse of investor money without the labyrinth of corporate structures and accounts set up by HWG for that purpose.  And both HWG and Harkins profited from the fraud – HWG was kept afloat and took investor money earmarked for its subsidiary corporations and Harkins received salaries, bonuses, and even the home he lives [in] from the concerted wrongdoing."  Docket No. 99 at 11.  Mr. Harkins does not argue that joint-and-several liability is inappropriate. *See generally* Docket No. 101.

In *Mahabub*, the court determined that "[a]ll of the deceptions in question were perpetrated by Mahabub on GenAudio's behalf as its CEO."  *Mahabub*, 411 F. Supp. 3d at 1173.  As in that case, the Court here finds that Mr. Harkins's deceptions were perpetrated on HWG's behalf.[17]  Moreover, the Court agrees with the holding in *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), which the court in *Mahabub*

---

[17] Although the district court's decision in *Mahabub* preceded *Liu*, the Tenth Circuit's decision in *GenAudio* came after *Liu*, but did not disturb the district court's imposition of joint-and-several liability.

also approved of, that

> where a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order.

*See also SEC v. Bronson*, 2022 WL 1287937, at *15 (S.D.N.Y. Apr. 29, 2022) (imposing joint-and-several liability because "[t]here is therefore no question that Bronson was integral to the scheme, which he ran through the companies that he controlled." (citing *SEC v. Westport Cap. Markets, LLC*, 547 F. Supp. 3d 157, 171 (D. Conn. 2021) (imposing disgorgement award jointly and severally where "[the individual defendant] owns [the entity defendant], and he wears just about every hat of importance in the company" and finding that "[i]t is beyond dispute that [the entity defendant] and [the individual defendant] each received substantial benefits from their concerted, wrongful activities"); *SEC v. Penn*, 2021 WL 1226978, at *13 (S.D.N.Y. Mar. 31, 2021) ("[The individual defendant] and his entities carried out the fraud together, making joint and several liability for disgorgement appropriate.")).  Accordingly, the Court will hold Mr. Harkins and HWG jointly-and-severally liable for the full sum of the disgorgement award.

### 4.  Prejudgment Interest

The SEC next argues that the Court should award prejudgment interest of $1,224,424.91, computed from October 1, 2017 and ending April 30, 2022, with the interest rate calculated by the Internal Revenue Service ("IRS") for underpayment of federal income tax.  Docket No. 99 at 11–12 (citing *SEC v. Erwin*, No. 13-cv-03363-

CMA-KMT, 2021 WL 3206325, at *5 (D. Colo. July 29, 2021) (explaining that, "[g]enerally, disgorgement includes prejudgment interest to ensure that wrongdoers do not profit from their illegal conduct," and calculating prejudgment interest based on the rate used by the IRS for underpayment of federal income tax)).  Mr. Harkins sole objection to the imposition of prejudgment interest is his one-sentence insistence that, "[w]ith the net profit number available to charge interest against being zero, no interest calculation is logical or needed.  Interest is zero."  Docket No. 101 at 9.  Because the Court rejected Mr. Harkins's arguments against disgorgement and he provides no other argument against prejudgment interest, the Court finds that prejudgment interest is necessary and appropriate to ensure that defendants do not profit from their conduct and will order defendants to pay prejudgment interest in the amount of $1,224,424.91.

### B.  Civil Penalties

The SEC asks the Court to impose $8,707,825.80 civil penalties against "each [d]efendant, an amount equal to their gross pecuniary gain."  Docket No. 99 at 12–18. Sections 20(d)(1) of the Securities Act of 1933 and 21(d)(3)(A) of the Securities Exchange Act of 1934 provide that the SEC may seek, and a court may impose, civil monetary penalties for securities violations.  If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," a court may impose a "third tier" penalty, which may be the "gross amount of pecuniary gain to such defendant as a result of the violation."  *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

Penalties "are designed to deter future violations of the securities laws and

thereby further the goals of 'encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.'" *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (quoting *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)).  "[W]hereas disgorgement 'merely restores [the] defendant to his original position without extracting a real penalty for his illegal behavior,' . . . the imposition of civil penalties is appropriate to accomplish the goal of punishment."  *Id.*  As the court in *GenAudio* explained, courts typically consider the following factors when imposing penalties under the securities laws:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*GenAudio*, 32 F.4th at 954 (quoting *SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)).

As to the first three factors, the SEC argues that the evidence at trial showed that defendants engaged in "flagrant, intentional, and recurrent lies to investors," which were especially egregious because Mr. Harkins "knew that some of his investors were giving him substantial portions or even all of their life savings."  Docket No. 99 at 13.  In finding that Mr. Harkins violated Section 10(b) of the Exchange Act and Rule 10b-5, *see* Docket No. 94 at 2, the jury determined that Mr. Harkins acted with scienter.  In compounding his lies with more lies, the SEC argues that Mr. Harkins engaged in a pattern of behavior and, because each lie Mr. Harkins told required him to "contrive something more complicated than the truth," he acted with a "high degree of scienter."  Docket No.

99 at 13.  The SEC also argues that HWG acted in concert with Mr. Harkins because

Mr. Harkins and other HWG executives used HWG to "creat[e] the corporate labyrinth"

used to "deceive investors about the value of the parks and the use of their money."  *Id.*

at 13–14.  The SEC highlights the "temp loan" program, where Mr. Harkins and HWG

used temporary loans to pay investors and expenses, but never repaid the loans.  *Id.* at

14.

      Mr. Harkins responds only by insisting that he returned loan amounts to lenders,

ran a legitimate business, and "DID NOT operate with scienter."  Docket No. 101 at 9.

However, the jury found otherwise.  Mr. Harkins does not address these factors listed in

*GenAudio* with any specificity.  The Court agrees with the SEC.  The evidence at trial

and the jury's verdict show that Mr. Harkins and HWG committed repeated, egregious

violations of the securities laws and acted with scienter.  The first three factors weigh in

favor of a civil penalty.

      As to the fourth factor, the SEC argues that neither defendant has ever admitted

wrongdoing.  Docket No. 99 at 14–15.  The Court agrees.  At trial, Mr. Harkins insisted

that he did nothing wrong.  *See, e.g.*, Unofficial Tr., Apr. 13, 2022 at 39 ("I can tell you, I

can sleep good at night.  I have a clear conscience over what I have chosen to do."), *id.*

at 41 ("In spades, [the SEC has] not protected investors in this case.  The activities that

transpired did anything but.  They created the burden on a small company to deal with

an inquiry that ultimately ended up breaking the organization."); *id.* at 42–43 ("I wouldn't

trust them – meaning the SEC agency – to do the right thing ever.  It is an agency built

by and for lawyers to be lawyers and win cases rather than do the right thing.").  In his

motion, Mr. Harkins states that he "did not lie to anyone. . . .  The SEC twisted

everything OUT of context."  Docket No. 98 at 4.  In his response to the SEC's motion

for remedies, Mr. Harkins states, "I absolutely have a failure to admit wrongdoing

because I did not do wrong."  Docket No. 101 at 9.  HWG also did not accept

responsibility, as it never appeared in this lawsuit, and the Court entered default

judgment against it.  *See generally* Docket Nos. 57, 75.  This factor strongly supports

the imposition of a civil penalty.  Without a civil penalty to deter future violations,

defendants may violate the securities laws again.  Mr. Harkins's response shows that he

still holds the dangerous and incorrect belief that "Real Estate Entrepreneurs" have a

special right to be free from the securities laws and the SEC's enforcement.  *See*

Docket No. 101 at 1–2 ("Defendants, during the timeframe of the activities in question,

were NOT operating under the pretense of trying to follow Securities Disclosures; we

were operating as Real Estate Entrepreneurs.").  The fact that Mr. Harkins continues to

blame the SEC, has little to no empathy for investors who lost everything, and believes

that *he* was the victim makes it likely that he will continue to violate the law.  *See*

*Lybrand*, 281 F. Supp. 2d at 729 ("A monetary penalty is designed to serve as a

deterrent against securities law violations.").

The fifth factor also supports a penalty.  As the SEC notes, investor losses

amounted to millions of dollars.  *See* Docket No. 99 at 15–16.  One investor, Robert

Cutler, lost his retirement savings.  *See* Unofficial Tr., Apr. 4, 2022 at 189.  Another

investor, Ms. Rants, lost her inheritance.  *See* Unofficial Tr., Apr. 6, 2022 at 218–22.  A

third, Mr. Tice, lost $1.5 million.  *Id.* at 108.  Mr. Harkins acknowledges that some

investor losses "ended up being significant."  Docket No. 101 at 9.

The sixth factor is defendants' cooperation and honesty with authorities.  *See*

*GenAudio*, 32 F.4th at 954.  The SEC states that, for years, defendants engaged in

"obstructive behavior" with the SEC's investigation, which required the SEC to file an

action to enforce a subpoena.  *See* Case No. 18-mc-00190-CMA, Docket Nos. 1-1, 1-4,

3.  Defendants informed the SEC, "[y]ou are hereby notified that compliance with any

requests by the SEC is hereby suspended involving HW[G], myself[,] and any of my

unemployed former personnel."  *Id.*, Docket No. 1-4 at 76.  Jason White, an HWG co-

founder, evaded service and lied and threatened a process server.  *See id.*, Docket No.

7-5.  That case was assigned to Judge Christine M. Arguello, who ordered compliance

with the subpoena, *see id.*, Docket No. 11, yet Mr. White, Mr. Harkins, and HWG still

refused to produce documents.  *Id.*, Docket No. 24-1.  Judge Arguello ordered HWG to

show cause why it should not be held in contempt and held a contempt hearing, *id.*,

Docket No. 25, yet neither Mr. Harkins, Mr. White, nor HWG appeared at the hearing,

*id.*, Docket No. 29, and Judge Arguello held them in contempt.  *Id.*, Docket No. 31.

Defendants' complete "disregard for the law and judicial process," *see SEC v. Turbo

Global Partners, Inc.*, 2020 WL 7753136, at *6 (M.D. Fla. 2020), supports a civil penalty.

The seventh factor is whether defendants' ability to pay should reduce the

penalty.  *See GenAudio*, 32 F.4th at 954.  The SEC argues that, "given [Mr.] Harkins's

age and self-styled occupation as an 'entrepreneur,'" the Court should not award a

lower penalty.  Docket No. 99 at 18.  Mr. Harkins responds that he is a farmer and

expects to continue to be a farmer.  Docket No. 101 at 9.  He attaches what purports to

be IRS 1099-K Forms for credit card point-of-sale transactions for his farm in Montana.

Docket No. 101-6.  These forms reflect annual income of between $21,574.40 in 2018

and $68,865.89 in 2021 for Mr. Harkins individually and "Adventure Projects, LLC,"

which has the same address as Mr. Harkins.  *See id.*

However, as the SEC notes, these 1099-K Forms do not conclusively demonstrate the extent of Mr. Harkins's or HWG's income, as Mr. Harkins does not state that the forms reflect all of his farm's revenue and, unlike in *Mahabub*, provides no sworn affidavit.  *See* Docket No. 102 at 9; *see also Mahabub*, 411 F. Supp. 3d at 1174–75.  Moreover, the SEC notes that other documents Mr. Harkins has filed show that HWG still owns a note that Mr. Harkins claims is worth $3,220,000.00 in connection with Farr Road.  *See id.* (citing Docket No. 101-5).[18]

Regardless, even assuming that defendants do not have the ability to pay a penalty, this factor, although a major consideration, is not dispositive.  *See GenAudio*, 32 F.4th at 954–55 (noting that "[t]he major factor weighing against a penalty . . . would be [Mr.] Mahabub's claimed financial straits," yet underscoring that Mr. "Mahabub's ability to pay is only one factor among many," which favor a penalty) (quoting *Mahabub*, 411 F. Supp. 3d at 1175).  The court in *Mahabub* noted the defendant's repeated lies, failure to concede wrongdoing or admit dishonesty, and substantial amount of loss he caused investors and ordered a sizeable penalty even though the defendant claimed that he only had $4.94 in his bank account. *See Mahabub*, 411 F. Supp. 3d at 1175; *GenAudio*, 32 F.4th at 954.

*GenAudio* noted that, even if it is correct that inability to pay is one of the most important factors, *see GenAudio*, 32 F.4th at 955 (quoting *SEC v. Gunn*, 2010 WL 3359465, at *10 & n.25 (N.D. Tex. Aug. 25, 2010)), "there is no dispute that this factor

---

[18] Mr. Harkins argues that HWG is defunct and has no assets.  *See* Docket No. 101 at 9.

should not be deemed categorically and uniformly the determinative one in the analysis."  *Id.* (citing *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) ("[N]othing in the securities laws expressly prohibits a court from imposing penalties ... in excess of a violator's ability to pay. . . .  [Defendant] cites no decisional law stating that the securities laws impliedly prohibit a district court from imposing penalties . . . in excess of a violator's ability to pay, and we have located none.  At most, ability to pay is one factor to be considered in imposing a penalty.")); *see also id.* ("Here, the district court determined – after thoughtful consideration of the relevant factors – that Mr. Mahabub's purported inability to pay should not tilt the decisional balance against the imposition of a penalty.  We discern no abuse of discretion in the court's decision.").

"Although each tier establishes a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court."  *Universal Exp.*, 646 F. Supp. 2d at 567 (citation omitted).  Courts frequently impose civil penalties equal to disgorgement, for instance.  *See, e.g.*, *SEC v. BIC Real Est. Dev. Corp.*, 2017 WL 1740136, at *6 (E.D. Cal. May 4, 2017) (collecting cases).  Other courts reduce penalties after considering the relevant factors.  *See, e.g.*, *SEC v. RMR Asset Mgmt. Co.*, 553 F. Supp. 3d 820, 828 & n.5 (S.D. Cal. 2021) ("[T]he Court exercises its discretion to reduce the SEC's requested civil penalties." . . . "As the balance of factors do not overwhelmingly favor a reduction, the Court finds that a modest twenty percent reduction is reasonable.").

In imposing a civil penalty, the Court may also consider "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect."  *Universal Exp.*, 646 F. Supp. 2d at 568 (levying a monetary penalty of $1 million

and noting that this amount was appropriate since defendant would already be required to pay $13 million in disgorgement and prejudgment interest and had been permanently enjoined from participating in trading stock); *SEC v. Hansen*, 2017 WL 1232716, at *7 (S.D.N.Y. Mar. 31, 2017) ("I also consider the extent to which other relief and judgments ordered in this matter will have the desired punitive effect."); *SEC v. Bronson*, 246 F. Supp. 3d 956, 978 (S.D.N.Y. 2017) ("Defendants will be required to pay multiple millions in disgorgement and prejudgment interest and have been permanently enjoined from engaging in further violations of § 5 of the Securities Act or trading in penny stocks. These penalties lessen the responsibility of the fine to provide a retributive and deterrent effect." (quotation and citation omitted)), *aff'd SEC v. Bronson*, 756 F. App'x 38 (2d Cir. 2018) (unpublished); *SEC v. Nadel*, 2016 WL 639063, at *26 (E.D.N.Y. Feb. 11, 2016), *report and recommendation adopted*, 206 F. Supp. 3d 782 (E.D.N.Y. 2016); *SEC v. Svoboda*, 409 F.Supp.2d 331, 348 (S.D.N.Y. 2006) (viewing defendant's financial submissions "with skepticism" but determining that imposition of over $3 million in civil penalties on top of $2.2 million "already imposed . . . and the $300,000 fine assessed . . . goes too far"); *SEC v. Neurotech Dev. Corp.*, 2011 WL 1113705, at *6 (E.D.N.Y. Feb. 28, 2011) (finding defendant's "current situation and the other remedies awarded against him . . . [warrant] a reduced penalty [which] would serve the purpose of deterring future conduct"); *SEC v. Mortenson*, 2013 WL 991334, at *9 (E.D.N.Y. Mar. 11, 2013) ("Under the circumstances of this case, I find the appropriate third-tier civil penalty to be an amount equal to one-half of the disgorgement amount."); *but see Mahabub*, 411 F. Supp. 3d at 1175 (imposing penalty equivalent to the gross amount of pecuniary gain against individual and corporate defendants); *SEC v. Spongetech Del.*

*Sys., Inc.*, 2015 WL 5793303, at *11 (E.D.N.Y. Sept. 30, 2015) (imposing maximum third-tier civil penalties, but noting that, despite defendant's submission of a financial affidavit in support of his inability to pay a penalty, "he has failed to make any showing regarding his actual financial condition . . . [and] has not supported his claims with any documentation.").

Although the Court finds the imposition of a third-tier penalty to be appropriate, a penalty equal to defendants' gross pecuniary gain would no better punish defendants' wrongdoing or deter future violations of the securities laws than would a lesser penalty, especially given the substantial disgorgement that the Court has already ordered. Accordingly, the Court will impose a civil penalty equal to one-half of each defendant's disgorgement amount, which is $3,502,166.64.

### C.  Permanent Injunction

Finally, the SEC requests a permanent injunction against defendants' future violations of the securities laws.  Docket No. 99 at 19–20.  "An injunction based on the violation of securities laws is appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future."  *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993).  Determining the likelihood of future violations "requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations."  *Id.*; *see also SEC v. Cell>Point, LLC*, No. 21-cv-01574-PAB-KLM, 2022 WL 444397, at *8 (D. Colo. Feb. 14, 2022).

Mr. Harkins states that he has "no argument against a well worded [i]njunction" and that he is "happy not to violate laws and rules."  Docket No. 101 at 10.  Given the pervasiveness of defendants' securities violation, which Mr. Harkins committed with scienter, and unwillingness to accept responsibility, the Court finds a permanent injunction is appropriate.  *See SEC  v. Cap. Holdings, LLC*, No. 03-cv-0923-REB-CBS, 2008 WL 5381464, at *1 (D. Colo. Dec. 19, 2008).  Accordingly, the Court will permanently enjoin defendants from violating Sections 17(a), 5(a), 5(c) of the Securities Act, and Section 10(b) and Rule 10b-5 of the Exchange Act.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's Motion to Dismiss Notwithsatanding [sic] the Verdict Under Rule 50 [Docket No. 98] is **DENIED**.  It is further

**ORDERED** that Plaintiff United States Securities and Exchange Commission's Motion for Remedies and Final Judgment [Docket No. 99] is **GRANTED in part**.  It is further

**ORDERED** that defendants, jointly and severally, shall disgorge $7,004,333.29, including $5,779,908.38 in net profits and $1,224,424.91 in prejudgment interest.  It is further

**ORDERED** that defendant Tytus W. Harkins shall pay a civil penalty of $3,502,166.65.  It is further

**ORDERED** that former defendant Hartman Wright Group, LLC shall pay a civil penalty of $3,502,166.64.  It is further

**ORDERED** that defendant Tytus W. Harkins and former defendant

Hartman Wright Group, LLC are permanently enjoined from violating Section

17(a) of the Securities Act, 15 U.S.C. § 77q(a); Sections 5(a) and 5(c) of the

Securities Act, 15 U.S.C. §§ 77e(a) and (c); Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b); and Rule 10b-5 of the Exchange Act, 17 C.F.R. § 240.10b-5.

It is further

ORDERED that plaintiff United States Securities and Exchange

Commission shall file a proposed order, within 14 days, detailing how, when, and

to whom the disgorgement and civil penalties shall be paid.

DATED August 23, 2022.

BY THE COURT:

_____
PHILIP A. BRIMMER
Chief United States District Judge